THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JANETTE DALLAS *et al.*, Defendants-Appellants.

First District (5th Division)   No. 78-602

Opinion filed May 16, 1980.

154

Ralph Ruebner and Gary Jay Ravitz, both of State Appellate Defender's Office, of Chicago, for appellant Janette Dallas.

Frederick F. Cohn, of Chicago, for appellant Curtis Cooper.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Joan S. Cherry, and Terence P. Gillespie, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE WILSON delivered the opinion of the court:

After a jury trial, defendants Curtis Cooper and Janette Dallas were each found guilty of aggravated battery (Ill. Rev. Stat. 1975, ch. 38, par. 12—4), armed robbery (Ill. Rev. Stat. 1975, ch. 38, par. 18—2), and attempt armed robbery (Ill. Rev. Stat. 1975, ch. 38, pars. 8—4 and 18—2), and Cooper was found guilty of the additional charge of attempted murder (Ill. Rev. Stat. 1975, ch. 38, pars. 8—4 and 9—1). Cooper was sentenced to concurrent prison terms of 17 to 20 years for the armed robbery, 17 to 20 years for the attempt murder, and 6 to 20 years for the attempted armed robbery, and Dallas was sentenced to concurrent terms of 10 to 12 years for the armed robbery, 3 to 10 years for the attempt armed robbery, and 1 to 10 years for the aggravated battery. On appeal, they contend that (1) they were denied due process of law and the right to

a trial by an impartial jury when the court refused to ask a specific question during *voir dire* examination; (2) they were denied effective assistance of counsel when they were each represented by an assistant Cook County public defender despite various conflicts of interests between them; and (3) they were denied a fair trial by certain statements made by the assistant State's Attorney during closing argument. Additionally, Cooper contends that (1) he was denied due process when he was unable to prove that an array of photographs shown to witnesses was unnecessarily suggestive because the police failed to retain the photos; (2) he was denied a fair trial when the court prevented him from impeaching a witness with a tape recording of a prior inconsistent statement; (3) he was denied a fair trial by the presentation of prejudicial evidence and innuendos; (4) the trial court committed plain error when it improperly instructed the jury on the elements of attempt murder; and (5) the trial court abused its discretion in sentencing him. Although we find that some error occurred in the trial court, we affirm the judgment of the trial court.

Most of the basic facts of the offenses charged in this case are not in dispute. On December 24, 1975, at about 7:30 p.m., Sisters Noreen Burns and Ramona Nowak, two Roman Catholic nuns who were at the time not dressed in their religious garb, were robbed at gunpoint by a man and woman in the vicinity of 82nd and Ashland Avenue. After the man took Sister Burns' purse and the woman searched Sister Nowak's pockets, the nuns pushed away their assailants and attempted to flee. As Sister Burns called for help, the man shot her in the stomach. At trial, the bullet remained lodged in her body in close proximity to her vital organs. After shooting Sister Burns the man and woman fled down an alley. Their identity is in issue in this case.

### State's Case in Chief

At trial, Sister Burns positively identified defendants Cooper and Dallas as the man and woman who were involved in the December 24 incident. She stated that she first saw the man and woman as she and Sister Nowak walked past the northwest corner of 82nd and Ashland on their way to their car. The man and woman were the only people that she saw on the street at that time. They were facing in the opposite direction and thus she was unable to see their faces. However, she was able to tell that the man was very tall and slender and the woman was shorter than the man. After she and Sister Nowak turned the corner, heading west towards their car, the man and woman came up behind them and the man thrust a sharp object into Sister Burns' back, telling her, "I'm going to blow your brains out, get over to the car." She then turned around and had her first opportunity to see the man's face; she also "noticed" or "saw"

the woman, but it is unclear whether she saw the woman's face.[1] The man and woman then pushed her and Sister Nowak face-forward toward their car and ordered them to put their hands on top of the car. After they had done so, the man ordered Sister Burns to give her purse to him. As Sister Burns turned to her right to give the man her purse, she again saw his face. Her trial testimony on this point, however, differed somewhat from her preliminary hearing testimony. At trial, she testified that she made a three-quarter turn or turned completely and was facing the man when she gave him the purse. At the preliminary hearing, she testified that she turned a little "sideways" when she gave the man her purse and she only saw him "sideways." Also, her trial and preliminary hearing testimony differed on whether she saw the woman on this occasion. At trial, she testified that when she turned to give the man the purse she did not see the woman, but, at the preliminary hearing, she testified that she "caught a glimpse" of the woman. After Sister Burns gave the man her purse, he again ordered her to turn around and put her hands up against the car. While there, she was able to see the woman as she was searching Sister Nowak's jacket pockets. At trial, she testified that she saw the woman's face for a matter of seconds; at the preliminary hearing, she testified that she got a "glimpse" of the woman. While Sister Burns stood at the car, she heard Sister Nowak tell the woman: "Do you know what you are doing? You must be crazy." The woman told Sister Nowak to "shut up."

After the woman had completed her search, the man ordered Sister Burns and Sister Nowak into their car. When Sister Burns refused, the man pushed the sharp object deeper into her back and again ordered her into the car. She then turned, pushed him out of the way, and sped past the man and the woman toward Ashland Avenue. While she was doing this she again saw the man's face, but she did not see any gun. At one point in her testimony, she said that she did not see the woman's face but she later contradicted herself by saying that she was positive that she saw the woman's face too. As she approached Ashland, she saw someone in the crosswalk and yelled for help. She then turned and pointed to her assailant as he was running toward an alley, just west of the robbery scene. As she pointed, the man turned around, raised his gun, and pointed it toward Sister Nowak who had been chasing him. When Sister Burns again yelled for help, the man changed his aim and shot Sister Burns in the stomach. When he fired, he was standing about 25 feet away from her and

---

[1] Dallas claims that the following exchange between her counsel and Sister Burns indicates that Sister Burns did not see the woman's face:

"Q: And in regard to the woman, did you not see her face at this time, is that correct?

A: That's correct."

We believe that this exchange is too confusing to establish that Sister Burns did not see the woman's face.

she was again able to see his face. After the shooting, the man and woman ran in a northerly direction up the alley.

Sister Burns testified that at the time of the incident, the scene of the crime was blanketed with freshly fallen snow and illuminated by street lights on all four corners of 82nd and Ashland, a sodium vapor light at the alley, and lights from passing cars. She said that the incident, from approach to flight, took about 60 seconds, during which time she saw the male offender for either more than 20 seconds or "probably about" 40 seconds and the female for about 10 seconds. During the time she had to view the male offender, she did not notice whether he had any facial hair on him or whether he was a light or dark complected black, but she did notice that he was very tall and very thin. During the time she had to view the female offender, she did not notice if she was a light or dark complected black.

After the incident, Sister Burns was taken to a hospital where she was shown photographs of male and female suspects by police officers on December 26. At trial, she stated that she selected defendant Cooper's black and white photograph from 5 black and white photographs of black males. At the preliminary hearing, she testified that she had chosen a color photograph of Cooper. In either event, she told the police that she was sure that Cooper was the man who had robbed her. She also selected defendant Dallas' photograph from five photographs of black females and told the police that she was the woman who had robbed her.

At a preliminary hearing on January 29, 1976, Sister Burns saw defendants Cooper and Dallas for the first time since the incident. Before the case had been called, she saw Cooper walk through the courtroom door. When she saw him, she pointed him out to Sister Nowak and told her that he was the man who had robbed them. She testified that Cooper was not the only black who had entered the courtroom and that she had not seen any photographs of him since the December 26 photo display. Also, she saw defendant Dallas either standing in an adjoining room to the courtroom with other black females before the case was called or as she stepped out of that room as the case was called. When Sister Burns saw Dallas, she told Sister Nowak that she was the woman who had robbed them.

At trial, Sister Ramona Nowak also identified defendants Cooper and Dallas as the man and woman who were involved in the December 24 incident. She said that she did not see anyone on the street until after the woman began searching her pockets. At that time, she turned around and saw the woman "eyeball to eyeball." She noticed that the woman was wearing a curly wig and high gloss makeup. She told the woman, "You have got to be kidding. Do you know what you are doing?" The woman looked at her and told her to "shut up." The man then told Sister Nowak,

"Turn around and put your hands up on the car or I will blow your brains out." As she complied with his order, she "saw" the man who was holding a gun in Sister Burns' back. At trial, she testified that she got a "good look" at the man; whereas, at the preliminary hearing, she testified that she "caught a glimpse" of him. Shortly thereafter, the man ordered the nuns into the car, but they both refused the order. The nuns then pushed away from their assailants and ran towards Ashland. As Sister Nowak ran past them, she again saw the woman's face. The man and woman chased the nuns for a while but they stopped and ran in the opposite direction towards an alley when the nuns called for help. Sister Nowak then ran after the man and woman. The man stopped at the alley and then raised the gun with two hands and pointed it at Sister Nowak. She stopped dead in her tracks and looked directly at the man as he pointed the gun at her. She then turned and faced northward from which point she was able to see the man on her left and Sister Burns on her right. As Sister Burns continued to call for help, the man aimed his gun at Sister Burns and shot her in the stomach. At trial, Sister Nowak testified that she was not looking over her left shoulder when the shot was fired. At the preliminary hearing, she testified that she was looking over her left shoulder at the man when he shot Sister Burns. In either event, after the shooting, she ran over to give assistance to Sister Burns.

Later that evening, Sister Nowak gave descriptions of the woman and man to police officers at the hospital. She described the woman as being older than the man, stocky, shorter than herself, and medium or dark complected. She told the police that the woman wore a curly wig and thought that she told the police that the woman was wearing high gloss makeup, but she could not remember if she told them that she had high cheek bones. No testimony was elicited concerning her description of the man other than her belief that she did not tell the police that the man had a mustache.

On December 25, Sister Nowal went to the police station to view a lineup of women. At trial, she testified that she could not recall if she was told that a suspect was in custody. At the preliminary hearing, she testified that she was told this. On her way to the lineup room, a police officer showed her photographs of male suspects. At trial, she described the photographs as a "large stack of photographs," "more than 5," "like a deck of cards." At the preliminary hearing, she described the photographs as "about" 5. At trial, she explained this conflict by saying that the police officer had a stack of photographs in his hand but may have only shown her 5. She selected a photo of defendant Cooper from the "stack" and said that he was the robber, but she also told the officer that she wanted to see him in person. At about 9 p.m., she viewed the lineup which included four black female suspects. She narrowed down her choice to two of the

suspects, including Dallas, and, after taking a closer look at Dallas, she told the police that Dallas was the woman involved in the crimes. Although she was certain of this, she initially refused to press charges. She said that she initially refused to press charges because: (1) she had worked in the black community and was aware of injustices suffered by blacks; (2) she first wanted to know how Sister Burns felt; and (3) she had recently visited a woman's lockup and knew what it was like.

On December 26, Sister Nowak viewed a lineup of male suspects, including defendant Cooper, and identified Cooper as the man involved in the crimes. She also identified both defendants at the preliminary hearing in January of 1976.

Cornelius Cross testified that at about 7:15 p.m. on December 24, 1975, he was driving in the vicinity of 82nd and Ashland with defendants and two musicians, named "G.G." and Steve. They were looking for a place to get beer. While looking for a parking place, he heard Dallas say, "I wonder where I can get some money from," but did not know whom she was talking to at the time. After he had found a parking spot on 82nd Street, near the mouth of an alley just west of Ashland, defendants left the car to get the beer. Dallas, who was wearing a curly hairstyle, did not take her purse with her when she left. She and Cooper were gone for only about 10 minutes, when Cross heard a shot and saw them running past his car and into an alley. He did not see anyone else at the time. He started up his car and drove to Marshfield, which is the first block west of Ashland, and turned north up that street. As he was driving up Marshfield, he saw defendants as they emerged from between two buildings. He stopped to pick them up. When they got in, Dallas was carrying a purse. Cooper told Cross, "Drive fast, someone is shooting." While Cross drove, he heard Dallas fumbling with something in the back seat and heard her say, "I think they were nuns." Cross eventually dropped his passengers off and went home.

On December 25, the police came to Cross' house and told him that two nuns had been robbed and shot in the vicinity of where he had been seen on the previous day. They placed him under arrest. He then gave the police defendants' names and addresses, and G.G. and Steve's names. Afterwards, they took him to the police station.

While Cross was at the station, Dallas came into the room where he was being kept and, upon seeing him, she said, "I don't know him. I have never seen him before." Three hours after Cross arrived at the station, he began giving the police a statement. Between 7:30 p.m. and 8:50 p.m., when Cross was asked certain questions, he told the police much of what had occurred on the previous day, but did not tell them about: (1) Dallas' statement that she needed money, (2) the gunshot, (3) Dallas' fumbling

through a purse, or (4) Dallas' statement that she thought the victims were nuns. At 8:50, the police officers left to conduct a lineup. At about 11:20 they returned and the statement was resumed. Cross then told the police the details which he had not covered in the earlier portion of his statement.

Michael Allen testified that at approximately 7:30 p.m. on December 24, 1975, he was driving in the vicinity of 82nd and Ashland with Richard Jackson and Robert Moncrete. As he proceeded westbound on 82nd, he heard a cracking sound and saw a flash of light coming from the edge of an alley just west of Ashland. He saw a man and woman standing at the edge of the alley, a woman clinging to a wall, and another woman and man standing by the woman who was clinging to the wall. He was not able to see any of their faces. He drove to the edge of the alley and when he got there he saw two people about a quarter of the way up the alley. They went into a gangway and did not reappear. After futilely waiting for them to reappear, Allen drove to Marshfield and headed north up that street.

On Marshfield, he saw a man and woman walking towards an automobile which was sitting at a curb. The man and woman had the same clothes and features as the man and woman he had seen on 82nd Street. Specifically, he said that the man that he had seen on 82nd Street was wearing a dark coat as was the man on Marshfield. He said that he did not tell defense counsel in a pretrial telephone conversation that the coat was white cashmere. He stated that as he drove past the car, he was able to see the face of the man for about 10 seconds before the man got into the car. He said that he did not have to look past Jackson to see what was happening on the east side of Marshfield. Also, he first denied telling defense counsel in a pretrial taped conversation that he saw the man for 10 seconds from the side. Then he said that if that statement were in the transcript of the conversation then it was improperly recorded. When asked if he told defense counsel in the taped conversation that he saw the man's features but could not recognize him, he said that when he spoke with them he had just awakened and things were vague to him. After the man entered the car, he followed it for a while, taking down a description of the car and its license plate number. After getting this information, he returned to 82nd and Ashland and gave this information to a police officer who was investigating the crimes.

On December 25, Allen was shown photographs of male suspects. At the request of the police, he narrowed his choice to three, then ultimately selected Cooper's photo from the trio. Sometime later, he viewed a lineup of male suspects, including Cooper, and pointed out Cooper as the man he had seen on Marshfield on December 24.

Officer Walter Tamberlin testified that his patrol car was the first patrol car at the scene of the crime. When he arrived, he noticed that the area was well lighted. He went to the mouth of the alley between Ashland and Marshfield and there noticed only two sets of footprints in the snow. He followed the prints in a northerly direction up the alley to a gangway where the footprints turned west. He then followed the footprints through the gangway out to the parkway on Marshfield. After he returned to his car, he met Allen and Jackson who gave him a description and a license number of a car which they had seen on Marshfield.

John O'Connor, superintendent of engineers for the Bureau of Electricity, testified that he was familiar with the lights in the vicinity of 82nd and Ashland. He said that they were functioning on the evening of December 24 and that "if someone stood at the intersection, midway between the two lights and Ashland Avenue, they could read, more than read the fine print on the Chicago Tribune. If they stood at the mouth of the alley, right at the curb, they could read the small print of the Chicago Tribune."

Officer Wilbur Jamison testified that he was the officer who showed the photographs of male suspects to Sister Nowak prior to her viewing the lineup on December 25. He said that after Sister Nowak had looked at the photographs, she made a "tentative" identification of Cooper but wanted to see the man in person. He was also the officer who conducted the lineup of female suspects. He said that after viewing the lineup, Sister Nowak made an identification of Dallas. As was police procedure when an identification was made, photographs of the lineup were taken.

Sometime after the lineup, Officer Jamison called assistant State's Attorney Paul Kayman to inform him of the results of the lineup. At first, he testified that he told Kayman that Sister Nowak had identified Dallas but refused to sign a complaint for various reasons. A little later, he testified that he told Kayman that no identification had been made and then, he again testified that Sister Nowak had made an identification but refused to press charges. Kayman rejected filing charges against Dallas. Later, Sister Nowak relented and decided to file charges against Dallas. Officer Jamison then sought to contact Kayman about Sister Nowak's decision but he was unsuccessful. He did, however, get the charges approved by a division supervisor.

Officer Jamison wrote two reports on the lineup. In the first, he indicated that Sister Nowak said that Dallas "looked like" the offender but that the offender wore shiny makeup and a different type of wig. In the second, a supplementary report written about the same time as the first, he indicated that Sister Nowak "positively" identified Dallas from the lineup but that she stated that Dallas wore facial makeup and a different type of wig at the time of the offense.

DEFENSE CASE IN CHIEF

Curtis Cooper testified that he was not at 82nd and Ashland on the date and at the time of the crimes. At about 4 p.m. on December 24, 1975, however, he was there with Cornelius Cross and Dallas. They had gone there to pick up Cross' brother, Lawrence, and his girl friend. When they arrived, Lawrence, who looked somewhat similar to Cooper, was not waiting for them. As a result, Cross told Cooper and Dallas that he would take them home and then come back to get his brother and girl friend. They left the area at about 4:15 p.m.

At about 6:15 p.m., Cooper arrived at his parents' home where he generally stayed more than two nights a week. When he entered, he saw his mother, stepfather, aunt and two sisters. Since his sisters were already leaving to buy him a present, he gave them some money to buy him a card for his stepfather. He then went up to his room and watched television. He remained in his room the rest of the night.

Cooper's two sisters and mother confirmed his whereabouts on the evening of December 24. They said that he arrived at about 6 or 6:30 p.m. and went to his room. At about 7 p.m., the sisters went to a store to purchase a gift for Cooper and a card for their stepfather. At about 8 p.m., they returned and gave Cooper the card. They went to bed at about 12:30 a.m.

Cooper's mother went to bed at 1 or 2 a.m. She said that Cooper did not leave the house until 11 a.m. on December 25. Later in the day, the police arrived. They told her that they were looking for Cooper. She told them that he was not there and allowed them to search for him.

Cooper's stepfather testified that he had gone to work at 2 p.m. on December 24 and had returned at 11:30 p.m.

Gilbert Gregory Hart, a musician who was also known as "G.G.", testified that although he knew Cross and Cooper, he was not with them at 82nd and Ashland at the time and on the date of the crimes. He stated that at one point he had told Cooper's attorney that he was at a Keyman's Club at that time and on the date, but the attorney told him that there was no record of the club being open. He said that he now believed that he was at Evergreen Plaza Shopping Mall on December 24 with a friend and his mother. On December 29, 1975, he returned to his original home State of Maryland. At the time, he did not know that the police were looking for him or that Cooper and Dallas had been arrested.

Susan Coleman, an employee of the public defender's office, testified that between 11 a.m. and 5 p.m. on March 8, 1977, she participated in a phone conversation with the defense attorneys and Allen. She was not aware that Allen worked nights and slept days. She could not recall if the telephone call awakened him. She said that during the conversation, Allen said that it was "pitch dark" when the incident

occurred and that the man he saw on 82nd Street was wearing a white cashmere coat. She also heard him say: "There is always room for doubt. I couldn't say that the man in the lineup was him for sure."

Officer Robert Kruger testified that he was one of the officers who showed photographs of male suspects to Sister Burns on December 26. At that time, she told him that the man pictured in one of the photographs "looked like" the male offender but that she would like to see the man in person.

Assistant State's Attorney Paul Kayman testified that when he spoke to Officer Jamison on December 25, Jamison told him that the nun did not want to make an identification. His log book for that date, however, indicated that no identification was made by anyone. He said that he advised Jamison to contact other witnesses before charges could be pressed.

## State's Rebuttal

Officer Dale Riordan testified from memory that on December 25 he asked Cooper's mother where her son had been on the previous night. She told him that she did not know, and that he was a grown man who came and went as he saw fit.

## Opinion

Defendants raise a number of issues and sub-issues in their respective briefs. Though we have carefully considered each and every one, we will only discuss those issues which require more than summary treatment. We summarily dismiss the remaining sub-issues as being without merit.

Defendants contend that they were denied due process of law and the right to a trial by an impartial jury when the court refused to ask prospective jurors whether they would give greater credibility to the testimony of the nuns simply because they were nuns.

Prior to *voir dire* examinations, the defense gave the court 140 questions which they wished to ask the venire. Included among these questions was a question which asked:

> "Will you avoid giving greater believability to the testimony of a Nun, than of any ordinary citizen just because the witness is a Nun?"

Instead of ruling on the propriety of this question and the other submitted questions, the court indicated that it would first conduct a general *voir dire* of all prospective jurors and then it would hear requests to ask specific questions. After the court had concluded the general *voir dire*, defense counsel requested the court to ask the prospective jurors if the fact that the victims were nuns would affect their ability to listen fairly and impartially to the facts and prevent any of them from rendering a fair

and impartial verdict. The court asked such a question and, after there was no response by the jury, proceeded to ask individuals and panels various specific questions. During the specific questioning of individuals and panels, defense counsel again asked the court to ask its question concerning the credibility of nuns, but the court refused. Defendants claim that none of the questions asked by the court adequately explored the area of the amount of credibility which the jurors would give to the testimony of the nuns simply because they were nuns. They argue that it was important to adequately explore that area because the nuns were very important witnesses whose testimony could be crucial. Since their question was not asked, they claim that they were prejudiced in their selection of an impartial jury and thus, they seek a reversal on this ground.

The only legitimate purpose of a *voir dire* examination is to assure the selection of an impartial jury. (*People v. Jackson* (1977), 69 Ill. 2d 252, 371 N.E.2d 602.) Under Supreme Court Rule 234 (Ill. Rev. Stat. 1975, ch. 110A, par. 234), the trial court has the primary responsibility in conducting the *voir dire* examination towards that end. Rule 234 does, however, add that the trial court "may permit the parties to submit additional questions to it for further inquiry if it thinks they are appropriate * * *." But, as the language indicates the court has discretion in making its decision. In reviewing the court's exercise of its discretion, we must determine whether the court's failure to ask defendants' tendered question thwarted the selection of an impartial jury in the instant case; if it did, then we must determine that the court abused its discretion in declining to ask defendants' question.

We find that the court did not abuse its discretion in refusing to ask defendants' question because the subject matter of the question was adequately covered by the court in its admonitions and questions to the prospective jurors. The court gave the jurors the following general admonition on credibility;

> "You will judge the credibility of the witnesses and the weight to be given to the testimony of each of them. In doing so you may consider his or her ability and opportunity to observe, his or her age, the memory, the manner, the interest, bias or prejudice of each witness and the reasonableness of his or her testimony considered in the light of all the testimony in the case and whether he or she is corroborated or contradicted by other evidence."

The court also warned the jurors to base their decision only on the evidence and "to make an honest and sincere attempt to arrive at a fair and impartial verdict * * *." These admonitions properly informed the prospective jurors of the factors which should be considered in judging credibility and the importance of basing their decision only on the evidence in the case.

Nonetheless, these admonitions were not sufficient in and of themselves to assure a fair and impartial jury. The court also had to ask questions which informed the jury that nuns were the victims in this case and that that fact should not in any way prevent them from rendering a fair and impartial verdict. We believe that the court fulfilled that duty when it directed the following combination statement and question to all of the prospective jurors:

"During the course of this trial it will be revealed that the two victims in this case were in fact Catholic nuns walking the public way, not in their habit. As you are aware of already the defendants are charged with the crimes of armed robbery and attempt murder of these two nuns.

I will ask you please if that would prevent any of you from listening fairly and impartially to the facts in this case and prevent any of you from rendering a fair and impartial verdict in this case?"

The court further explored this area in questions which, although directed at individuals or specific panels, were repeatedly made applicable by the court to all of the prospective jurors. For example, the court asked the following questions:

"Would the fact that the victims are Catholic in this case, would that have any effect on your ability to be fair and impartial in this case?"

"Do either of you have any religious preferences or ties that would prevent you from serving fairly and impartially as a juror in this case?"

"Would any affiliations or beliefs that any of the four of you have affect your ability to be fair and impartial jurors in this case knowing briefly what you do of the background of the case?"

Also, on at least two occasions, the court informed the jurors of the general proposition that the same standards should be applied in judging the testimony of each of the witnesses. In one such question, which was specifically directed to the first panel but made generally applicable to all prospective jurors by the court's repeated statements, the court asked:

"Would each of you be willing and in fact apply the same standards and judge the testimony of any police officer, in fact, any witness equally to each witness who testified whoever that witness may be, whether it be a victim, a police officer, lay witness, a defendant, defense witness, whatever else it might be? Would you use the same standard in judging the weight to be given to the testimony of each of those parties that testify?"

In the other, the court asked a prospective juror:

"If a Chicago police officer testified in this case, would you use the

same standards in judging the weight to be given to his testimony as you would any other witness?"

When a juror said that she would not use the same standards, the court dismissed her. We do not believe that the reason for her dismissal could not have been appreciated by the jurors.

■■ Admittedly, defense counsels' question would have more precisely explored the subject matter which they attempted to explore with that question. Nonetheless, as we have already noted, our task on review of a trial court's decision to not ask a specific question is to determine whether the failure to ask the question prevented the selection of a fair and impartial jury. Based on all of the court's other admonitions and questions to the prospective jurors, we cannot say that defendants were denied the right to select a fair and impartial jury by the court's decision.

The cases relied upon by defendants do not warrant a different result in the pending case. In *Coleman v. United States* (D.C. App. 1977), 379 A.2d 951, a case in which two of the victims of crimes were priests, the reviewing court affirmed the trial court's decision to refuse to ask the following questions during *voir dire*:

"If the evidence suggested it, could each of the members of this panel find, as a matter of fact, that a priest's testimony has been untruthful?

Is there any prospective juror who has any special affection for or grudge against priests in general?" (379 A.2d 951, 954.)

The court's reasoning was essentially that the specific area covered by these questions had already been covered in other questions which had been asked. The same is true in the instant case. In *Commonwealth v. Futch* (1976), 469 Pa. 422, 366 A.2d 246, a case in which the testimony of two prison guards provided *the crucial* evidence in the prosecution of an inmate for stabbing another inmate, the reviewing court reversed the trial court's refusal to ask the following questions:

" ' (1) Would the fact that all of Mr. Futch's material witnesses are incarcerated at Western Penitentiary make their testimony less believable than any witness that the Commonwealth may produce who are not prisoners?
* * *

.(3) Would you give more credence to the testimony of a prison guard than you would to a prisoner, simply because he is a prison guard?' " (469 Pa. 422, 426, 366 A.2d 246, 248.)

In reaching its decision to reverse, the court noted that none of the other questions asked during *voir dire* focused upon the potential bias aimed at by the above questions. In the instant case, however, the nuns' testimony was not the crucial testimony since there was other testimony which linked defendants to the crimes. Also, the other questions asked during

*voir dire* examination did sufficiently focus in on the bias at which defendants' question was aimed. In *Casey v. Roman Catholic Archbishop* (1958), 217 Md. 595, 143 A.2d 627, a case involving a suit by a parishioner against the defendant for alleged injuries arising out of a fall in a Catholic church in defendant's archdiocese, the reviewing court reversed the judgment of the trial court because the trial court's phrasing of a question on *voir dire* examination was too general to disclose a possible cause for disqualification by reason of bias or prejudice. In the present case, the court's *voir dire* examination was specific enough to disclose the cause for disqualification which defendants sought to bring out by asking their question.

Defendants next contend that they were denied effective assistance of counsel when they were each represented by an assistant public defender despite conflicts in their respective defenses.

After defendants' privately retained attorneys withdrew from the case, the trial court appointed individual assistant public defenders to represent defendants. At no time prior to or during trial did either defendant request a separate trial or appointment of another attorney. During trial, each assistant public defender actively and vigorously cross-examined the numerous State witnesses and called witnesses on behalf of both defendants. Defendant Cooper testified and presented an alibi defense. Defendant Dallas, however, did not testify but her discovery answer stated that: "The defendant will rely on the State's inability to prove the charges beyond a reasonable doubt. The defendant denies being present at scene of crime." Defendants claim that since they were both represented by attorneys from the public defender's office, in effect, they were represented by a single attorney. They state that this joint representation denied them the effective assistance of counsel due to certain conflicts of interests which occurred at trial. Dallas argues that the actual conflicts of interests which occurred were: (1) the defendants' defenses were inconsistent, antagonistic and materially hostile; and (2) her attorney had divided loyalties to her and Cooper and therefore could not call Richard Jackson, a witness who had testified at the preliminary hearing, to testify in her defense. Cooper basically argues that he was prejudiced by the joint representation by the possibility that exculpatory evidence may have been kept out of the record because of the joint representation.

■■ Initially, we must reject any claim by defendants that their being represented by two assistant public defenders *ipso facto* constitutes representation by a single attorney. As the Illinois Supreme Court recently pointed out in *People v. Miller* (1980), 79 Ill. 2d 454, 462, 404 N.E.2d 199, 203:

"Rather than applying a *per se* rule, thereby disqualifying an entire

public defender's office whenever one of its members is confronted with a conflict, a case-by-case inquiry is contemplated whereby it is determined whether any facts peculiar to the case preclude the representation of competing interests by separate members of the public defender's office."

Thus, in this case, as in cases in which a single attorney is representing a number of co-defendants, defendants must demonstrate an actual conflict of interests before we can say that they were denied effective assistance of counsel. See *People v. Berland* (1978), 74 Ill. 2d 286, 385 N.E.2d 649.

Dallas claims that an actual conflict of interests existed between her defense and Cooper's defense. She states that the conflict of interests became evident when, contrary to her reported stationhouse statement that she did not know Cross, Cooper testified that he, Cross, and Dallas were together at 82nd and Ashland at 4 p.m. on December 24, 1975. She asserts that as a result of the joint representation by the public defender's office, she could not cross-examine Cooper or contradict his statement because she did not take the witness stand and thus, her credibility was harmed by Cooper's testimony.

We find no conflict evident in Cooper's testimony which would lead us to conclude that she was denied effective assistance of counsel. Even though Cooper testified that he, Cross, and Dallas were together at 82nd and Ashland on December 24, his testimony in no way was inconsistent with the claim made in Dallas' apparent defense that she was not at the scene of the crime. Cooper testified that they were at 82nd and Ashland about 3½ hours before the crimes were committed. At 4 p.m., 82nd and Ashland was not the scene of the crime. Also, even though it could be argued that Cooper's testimony that they were together contradicts Dallas' stationhouse statement that she did not know Cross, we believe that it would be too conjectural to base a finding of inconsistent defenses on the contradictory nature of a single statement which has been testified to by someone other than the speaker and which certainly could be interpreted as a lie by Dallas to keep from implicating herself in the crimes. Furthermore, we believe that it is very significant that even if Cooper's testimony contradicted Dallas' stationhouse statement, it did not represent evidence that she was at the scene of the crime. As we see it, the defenses in this case are consistent: both defendants deny their guilt and do not attempt to redirect the guilt to each other. Under such circumstances, we find no conflict.

Dallas also claims a conflict based on her attorney's failure to call Richard Jackson as a witness. At a preliminary hearing, Jackson, who was allegedly in a car with Allen at the time of defendants' flight from the scene of the crimes, testified that he viewed a lineup of male suspects on

December 25 and identified Cooper as the man he had seen leaving the scene. He also stated, however, that a day or so after the men's lineup he viewed a lineup of female suspects, which included Dallas, but did not see the woman whom he had seen leaving the scene of the crimes. He further stated that while he was viewing the lineup, he overheard a nun, who was in an adjoining room, saying that she wasn't sure of identifying one of the women in the lineup because she would hate to identify someone and not have that be the person. Dallas argues that since the public defender's office was providing joint representation for Cooper and her, Jackson could not be called as a witness for fear that he would implicate Cooper, even though his testimony would be beneficial to her. As a result, she claims ineffective counsel.

We find that the failure to call Richard Jackson as a witness did not represent a conflict of interests warranting a finding of ineffective counsel because a proper foundation could not have been laid to introduce Jackson's testimony at trial. Jackson's testimony was that he overheard a nun expressing reluctance about identifying one of the women in a lineup. He did not testify that the nun was Sister Nowak nor did he testify that she was expressing reluctance about her identification of Dallas. Also, his testimony was that he overheard the statement when he viewed the lineup of female suspects "a day or so" after he viewed the lineup of male suspects. If he, in fact, viewed the lineup more than a day after he viewed the lineup of male suspects, he would be hard pressed to state that Sister Nowak was the nun whose statement was overheard since there is no testimony in this case that she was in the police station after December 26. Furthermore, Jackson never testified that he could identify the nun who made the statement. In fact some of his testimony suggests that Sister Nowak was not the person who made the statement. Yet, when asked at the preliminary hearing if he could recognize in court any of the women he had seen at 82nd and Ashland at the time of the crimes, he said that he could not despite the fact that Sister Nowak was assuredly in court since she had previously testified. His failure to recognize Sister Nowak, if she was in fact in court, and his failure to identify her as the person who made the statement suggests that she was not the person who made any statement which was overheard by Jackson.

Insofar as Cooper's claims of conflict of interests are concerned, we note that they are merely speculative. As was noted in *People v. Vriner* (1978), 74 Ill. 2d 329, 341-42, 385 N.E.2d 671, 676:

"In most criminal cases, strategy of counsel in presenting the defense must await the actual and perceived results of the prosecution's case. The final outcome invariably will disclose something that counsel could have done during the case that he did not do. Consequently, defense strategy in multiple representation

situations often will invite, through hindsight, conceived notions that the representation adversely affected the interests of at least one defendant at some point in the trial process. For us now to say that the presentation of the defense in this case demonstrated that an *impermissible conflict of interests existed from the outset of the* trial would be tantamount to adoption of a *per se* rule which, absent a knowing waiver, would require separate representation of criminal codefendants in every case. Before we arrive at the point of reversing a conviction without requiring a showing of prejudice to the defendant, a positive basis must be found for concluding that an actual conflict of interests existed."

Since no positive basis has been urged upon us by Cooper, we must reject his claims.

Defendants next contend that they were denied a fair trial by comments made by an assistant State's Attorney during closing argument. During the assistant State's Attorney's rebuttal argument, he argued:

"The last thing I want you to do is find these two people guilty because the victims were nuns or because it happened on Christmas Eve. I want you to find them guilty because the people who testified told you the truth on behalf of the State. The people who testified told you what happened, and you have a right, you have a duty to consider their background, from whence they come and where they are going, who are these two individuals, ladies and gentlemen. Are they just people off the street? They are human beings like you and I, granted. They just don't believe in the oath that they took when they said that they swore to tell the truth, so help them God. They not only believe, ladies and gentlemen, not to bear false witness against their neighbor, they teach it, they live it. That is not an occupation. That is a livelihood that they are in."

No objection was made to this argument. Later, the assistant State's Attorney argued:

"In order to find these two people not guilty, I do say to you that you have to find that these two nuns were lying."

Defense counsel objected to this argument and the trial court sustained the objection. Defendants claim that the arguments of the assistant State's Attorney were highly improper and constituted reversible error.

■■■ We find no error in the assistant State's Attorney's first argument. His argument properly stated the law and was certainly within the great latitude which is permitted a party during closing argument. (*People v. Hering* (1975), 27 Ill. App. 3d 936, 327 N.E.2d 583.) We do find error, however, in the assistant State's Attorney's second argument. His argument constituted a misstatement of law. (*United States v. Vargas* (7th

Cir. 1978), 583 F.2d 380.) To inform jurors that they have to choose between finding that State's witnesses are lying or telling the truth in order to make their decision is an incorrect statement of law and under certain circumstances requires reversal. For example, in *People v. Cole* (1980), 80 Ill. App. 3d 1105, 400 N.E.2d 931, we held that "[f]or the prosecutor in this case to inform the jury that in order to believe the defense witnesses the jury must find that each of the State's witnesses were lying is such a misstatement of law as to prejudice the defendant and deny him a fair trial." (80 Ill. App. 3d 1105, 1108.) Yet, the circumstances of *People v. Cole* are not the circumstances of the case before us. In this case, the assistant State's Attorney's comment was directed to the testimony of the victims; it was not directed to the testimony of *each of the State's witnesses.* Given the strength of the other evidence in this case, particularly the testimony of Cross, and the fact that the court immediately sustained an objection to the argument and later instructed the jury that closing arguments were not evidence, we find the error in this case to be harmless. *People v. Price* (1979), 76 Ill. App. 3d 613, 394 N.E.2d 1256.

Cooper contends that he was denied due process when he was unable to prove that arrays of photographs shown to witnesses were unnecessarily suggestive because the police failed to retain either the photographs or a list of the names of the persons depicted in the photographs.

The photographs referred to in this issue are the photographs of male suspects which were shown to Sister Burns in the hospital on December 26 and those which were shown to Sister Nowak in the stationhouse on December 25. None of the police officers who participated in the photograph displays retained the photographs. Cooper claims that without the photographs the trial court could not properly determine whether their display was suggestive.

■■ Although it is exceptionally poor police procedure to not retain photographs used in a photographic display at which an identification is. made, the law in Illinois is that photographs need not be produced in order to prove or disprove suggestiveness. (*People v. Brown* (1972), 52 Ill. 2d 94, 285 N.E.2d 1.) Suggestiveness may be demonstrated by testimony from the participants in the photographic display or by any other evidence relative to the inquiry. (*People v. Brown; People v. Jackson* (1973), 12 Ill. App. 3d 789, 299 N.E.2d 142.) A conviction based on eyewitness identification at trial after a pretrial photographic identification will be reversed, however, only if the photographic display "was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States* (1968), 390 U.S. 377, 384, 19 L. Ed. 2d 1247, 1253, 88 S. Ct. 967, 971.

We find no record support for Cooper's claim that the photographic displays were suggestive. At the preliminary hearing, Officer Dale Riordan, who was one of the officers who showed Sister Burns the photographs of male suspects, testified that he showed her six to eight color photographs which he had gotten from the unit file. He said that the photographs were of male blacks who were in their twenties. At trial, he testified that he looked for photographs "that closely resembled this photo (Cooper's) for the presentation to the Sister." Officer Riordan returned the photographs to the files prior to trial. At the preliminary hearing, Officer Robert Kruger, the other officer who showed the photographs of male suspects to Sister Burns, concurred with much of what Officer Riordan had said and, additionally, stated that he never told Sister Burns that any suspect was in the group of photographs. At the preliminary hearing, Sister Burns testified that she selected Cooper's color photograph from among other photographs which she viewed at the hospital. At trial, she testified that the photographs which she saw at the hospital were in black and white. We find nothing in any of this testimony which lends itself to a finding that the photographic display which took place at the hospital was suggestive.

· We also find nothing which supports a finding that the stationhouse photographic display was suggestive. At the preliminary hearing, it was stipulated that on December 24, Sister Nowak gave Officer Darryl DeYoung the following description of her male assailant: black, 30 years old, six feet tall, 170 pounds, and medium brown complexion. At the preliminary hearing, Officer Wilbur Jamison testified that he showed Sister Nowak five or six black and white photographs of black males, but that he did not recall what any of them looked like. At trial, he stated that it was his "function to select photographs of people who looked somewhat similar in their physical characteristics" and the photographs which he showed Sister Nowak were of people with "similar color, facial contour." At the preliminary hearing, Sister Nowak testified that nobody ever suggested an identification to her and that she was shown about 5 photographs. At trial, she testified that she saw a large stack of photographs. Despite this latter minor inconsistency, we cannot say that the photographic display was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."

Cooper contends that he was denied a fair trial when the trial court prevented him from impeaching a "crucial" witness, Michael Allen, with a tape recording of a prior inconsistent statement.

At trial, Michael Allen testified that while he was on Marshfield he was able to *see the face* of a man, whom he later identified as Cooper, for about 10 seconds. When defense counsel attempted to impeach Allen with a taped statement which indicated that Allen had to look across

Jackson to see the man "around ten seconds to the side," Allen stated either that he did not make that statement or that the statement was improperly recorded. Later in the trial, defense counsel moved to introduce the tape into evidence. The court refused to allow the tape into evidence and instead allowed the defense to call as a witness an individual who had been present during the taped conversation. This individual then testified to the accuracy and content of the transcript of that portion of the tape recording which defense counsel wished to introduce to impeach Allen. The transcript indicated that Allen had to look across Jackson to see the man "around ten seconds to the side." Cooper claims that the court's refusal to permit impeachment with the recording requires reversal.

Initially, we note that Allen was not a "crucial" witness in this case. Even without his testimony, the testimony of Sister Burns, Sister Nowak, and Cross and other corroborating evidence in this case was more than sufficient to convict Cooper. Thus, even if we were to find that the court erred in not allowing the tape recording into evidence, there would be no reversal on the basis of this argument.

■■ We find, however, that the trial court did not err in disallowing the tape recording into evidence. The basically unimpeached testimony of the individual who was present at the taped conversation covered the area which defense counsel wished to cover through use of the taped recording. Subsequent introducton of the tape recording could only have been cumulative. See *People v. Raby* (1968), 40 Ill. 2d 392, 240 N.E.2d 595.

Cooper contends that he was denied a fair trial as a result of an unresponsive answer to a question informing the jury that he had a prior arrest and improper cross-examination questions delving into his financial condition at the time of the crimes.

■■ During defense counsel's cross-examination of Officer Jamison regarding the photographic display shown to Sister Nowak, the following exchange occurred:

"Q: Was this, sir—this photograph marked Defendants' No. 2, was that photograph or a photograph similar to that shown to Sister Nowak by you?

A: This photograph was not shown to her.

Q: And was this a photograph similar to that?

A: Black and white.

Q: Was it the same poses in black and white?

A: The photograph that I showed Sister Nowak was a photograph of a prior arrest—

Mr. Goldberg [defense counsel]: Objection—I move to strike that."

The court did not rule on defense counsel's objection or motion to strike

but instead asked defense counsel if he wanted to withdraw the question. Defense counsel did not respond directly, but instead continued to ask Officer Jamison other questions. Cooper claims that this improper presentation of evidence of a prior arrest so discredited him in the eyes of the jury that the error requires a reversal.

Although we find error in the presentation of the evidence of Cooper's prior arrest, the error was harmless because the evidence in this case shows that Cooper was guilty beyond a reasonable doubt. In a very similar factual situation in *People v. Nicholson* (1978), 61 Ill. App. 3d 621, 377 N.E.2d 1063, we stated that:

> "Evidence relating to prior arrests of an individual is generally inadmissible into evidence if they have no relevance to the question of the guilt of the defendant other than the inference that he has a propensity to commit crimes. [Citations.] Yet the erroneous introduction of evidence of a defendant's prior criminal conduct does not, per se, constitute grounds for reversal; such an error may be considered harmless where the evidence shows that the defendant is guilty beyond a reasonable doubt." (61 Ill. App. 3d 621, 629, 377 N.E.2d 1063, 1070.)

The error was harmless here because the testimony of Sister Burns, Sister Nowak, and Cross as well as the other corroborating evidence firmly establishes Cooper's guilt beyond a reasonable doubt.

During the prosecution's cross-examination of Cooper, the following exchange occurred:

> "Q: Now, what was your visible means of support in December of 1975?
>
> Mr. Goldberg: Judge, I would object at this time. And I know— we're trying to bring all those things out myself.
>
> Mr. Cisco [assistant State's Attorney]: That is relevant at the time of the incident.
>
> The Court: I'll overrule the objection.
>
>      \* \* \*
>
> The Witness: I was on public aid at the time, and I did a little outside work, tune up, something like that.
>
> Q: Would it be safe to say, that you were not financially secure during December of '75?
>
> A: Yes."

Cooper claims that this line of questioning constituted an attempt to prejudice his cause before the jury simply because he was a poor man and as such was reversible error.

■■ Although we find it was error for the prosecution to cross-examine Cooper regarding his financial status at the time of the crimes, the error was harmless in light of the overwhelming evidence of Cooper's guilt.

The danger in asking a defendant questions concerning his financial status at the time of the commission of a robbery is that if defendant answers that he was in poor financial condition it might lead to an inference that since he was destitute he was more likely to have committed the robbery. Generally, such an inference is unfair and abhorrent to our system of justice. The only circumstance which would warrant the asking of such questions would be if there was some evidence that defendant stole because of his financial condition. In the present case, there was no such evidence. Dallas was the only one of the defendants who reportedly expressed a desire to get some money just prior to the time that the crimes were committed and there is no basis for attributing her motive to Cooper. Nonetheless, as we have said, even though the questions were clearly improper, the overwhelming strength of the case against Cooper makes the error harmless.

Cooper contends that reversible error was committed when the trial court improperly instructed the jury on the elements of attempt murder.

The trial court instructed the jury that they could convict Cooper of attempt murder if they found that he intended to do great bodily harm. No objection was made to the instruction at trial. Although the State concedes that the instruction was error (*People v. Harris* (1978), 72 Ill. 2d 16, 377 N.E.2d 28), it argues that the error was waived (*People v. Roberts* (1979), 75 Ill. 2d 1, 387 N.E.2d 331) or, alternatively, that the error was harmless because of the overwhelming evidence that Cooper acted with the intent to kill Sister Burns. *People v. Seats* (1979), 68 Ill. App. 3d 889, 386 N.E.2d 879.

■■ Even though Cooper failed to object to this erroneous instruction, we find the waiver rule inapplicable because the law, at the time of trial, was that an instruction like the one given in this case was proper. In *People v. Muir* (1977), 67 Ill. 2d 86, 365 N.E.2d 332, the Illinois Supreme Court approved of such an instruction. At a time after the trial in the instant case, the supreme court overruled itself in *People v. Harris* (1978), 72 Ill. 2d 16, 377 N.E.2d 28. In light of the timing of this shift in the law, we believe that it would be unfair to apply the waiver rule here.

■■ Nonetheless, even though the waiver rule is inapplicable, we find that the attempt murder conviction should stand because there was overwhelming evidence that Cooper acted with the intent to kill. An intent to kill can be shown by surrounding circumstances. (*People v. Seats.*) The circumstances in this case support such a finding. When Cooper first approached Sister Burns, he thrust a sharp object into her back and told her, "I'm going to blow your brains out." Later, he shot her in the stomach as she stood facing him at a distance of 25 feet. We believe that this combination of Cooper's words, the short distance between him and Sister Burns when he shot her, and the area of her body struck by the

bullet overwhelmingly supports an intent to kill. As a result, we reject Cooper's contention that reversible error occurred when the trial court erroneously instructed the jury.

Lastly, Cooper contends that his sentences of 17 to 20 years on the attempt murder and the armed robbery were both illegal and excessive.

After hearing arguments in aggravation and mitigation, the trial court prefaced its sentencing determinations with the following comments:

> "[B]eing mindful of what I consider to be the willful and wanton disregard of a human life that the shooter took in this case concerning Noreen Burns, and also in considering the seriousness of the offense in which you were both engaged, to wit, armed robbery, the taking by force property belonging to another against their will while armed, so as not to diminish the effect or seriousness of the crime, I feel that I must impose the following sentence * * *."

The court then sentenced Cooper to concurrent 17- to 20-year sentences for the attempt murder and armed robbery convictions. He claims that the sentences were illegal because they were not indeterminate and so excessive as to be an abuse of the court's discretion.

The minimum and maximum sentences in this case were authorized by law. Under the statute relevant to Cooper's sentencing, armed robbery is a Class 1 felony. (Ill. Rev. Stat. 1975, ch. 38, par. 18—2(b).) The minimum and maximum sentences for a Class 1 felony can be any term in excess of 4 years (par. 1005—8—1(b)(2), (c)(2)) and the minimum sentence may exceed one-third of the maximum sentence (par. 1005—8—1(c)(2)). Although there is no specific minimum sentence for attempted murder, a maximum sentence similar to one given a Class 1 felony may be given for that offense. (*People v. Moore* (1978), 69 Ill. 2d 520, 372 N.E.2d 666.) Also, as is the case with Class 1 felonies, a minimum sentence for attempt murder may exceed one-third of the maximum sentence for that offense. (*People v. Hammonds* (1973), 12 Ill. App. 3d 340, 297 N.E.2d 748.) Nonetheless, even though the minimum and maximum sentences were authorized by law, Cooper claims that the time spans between the minimum and maximum sentences were not indeterminate.

The purpose of indeterminate sentencing was to allow for an opportunity for parole or pardon at the best time for all concerned. (*Abernathy v. People* (1970), 123 Ill. App. 2d 263, 259 N.E.2d 363.) The proper span between minimum and maximum sentences, however, could not be determined by using any precise or rigid formula. (*People v. White* (1968), 93 Ill. App. 2d 283, 235 N.E.2d 393.) In reviewing a sentence which has a very narrow time span between minimum and maximum sentences, we must consider the reasons for such a sentencing determination as they appear on the record. See *Abernathy v. People.*

■■ We find that the 17- to 20-year sentences were sufficiently indeterminate in light of the facts and circumstances of this case. As the trial court pointed out in its comments before sentencing, the crimes committed were of a serious nature. Cooper was the gunman in a nighttime armed robbery of two defenseless women who were walking down a city street. During the commission of the crime, he thrust a sharp object into Sister Burns' back and threatened to "blow her brains out." He also later made the same threat to Sister Nowak. While Sister Burns was calling for help, he turned and shot her in the stomach, just missing her vital organs, at a distance of 25 feet. We believe that the nature and circumstances of these crimes properly warranted the trial court's comment that Cooper had demonstrated a willful and wanton disregard of a human life. Considering this willful and wanton disregard of human life, the trial court could have properly felt that the interests of "all concerned" would be better served if Cooper were given a sentence which would keep him off city streets for a longer period of time. Based on our conclusion that this is what was done here and that the sentence given was still indeterminate, we find the sentence proper.

We also find that the sentence was not so excessive as to constitute an abuse of discretion. Cooper claims that the 17- to 20-year sentences show absolutely no concern for his rehabilitative needs or potential. Yet, the crimes which were committed in this case were of a very serious nature, and Cooper played a very active role in their commission. Also, though Cooper did not have an extensive criminal record, this was not his first conviction. Just a month or so prior to December 24, he had been arrested for possession of ammunition and, subsequently, he was convicted and sentenced to a one-year conditional discharge. In light of these facts and background, we cannot say that the court abused its discretion.

Affirmed.

LORENZ and MEJDA, JJ., concur.