GOVERNMENT OF the VIRGIN
ISLANDS, Appellee,

v.

Charles FELIX, Appellant.

No. 77–1706.

United States Court of Appeals,
Third Circuit.

Argued Dec. 8, 1977.

Decided Jan. 27, 1978.

As Amended March 28, 1978.

John E. Stout, Grunert, Stout, Hymes & Mayer, Charlotte Amalie, St. Thomas, V. I., for appellant.

Julio A. Brady, U. S. Atty., Charlotte Amalie, St. Thomas, V. I., for appellee.

Before ADAMS, ROSENN and HUNTER, Circuit Judges.

## OPINION OF THE COURT

ADAMS, *Circuit Judge.*

This case arises out of an appeal by the defendant, Charles Felix, who was found guilty by a jury of murder in the first

---

1. The trial court in entering judgment imposed the mandatory sentence for that offense—life imprisonment without parole. Despite the fact that this would appear to be a particularly harsh punishment, the appellant has not directly questioned the sentence as such.

2. The court stressed that it was unwilling to order a psychiatric examination of the defendant on the basis of the evidence adduced at the hearing, particularly given that the defendant *opposed the government's motion for such an* examination. As the court stated:

degree.[1] On appeal, Felix contends that he is entitled to a new trial because (1) the trial court abused its discretion in conducting the *voir dire,* (2) the trial court erred in its rulings on the admission of evidence, (3) the trial court erred in denying the prosecution's motion for a psychiatric examination of the defendant, and (4) there was insufficient evidence to support the verdict. After considering these challenges, we have concluded that there is no ground for disturbing the conviction, and thus we affirm the judgment of the district court.

### A.

Felix, who was employed as a Corrections Officer by the Department of Public Safety of the Virgin Islands, shot Thomas Industrious on December 24, 1976, and Industrious died shortly thereafter. Felix was charged on December 28, 1976, in a one-count information with first degree murder.

After Felix entered a plea of not guilty, the United States Attorney, on February 24, 1977, filed a motion for a psychiatric examination of the defendant. Felix's counsel, at the request of his client, opposed the motion. The court, treating the motion as directed solely at the question whether the defendant was competent to stand trial, held a hearing on March 3, 1977. At the conclusion of the hearing, the court declared that " . . . this hearing clearly established to my mind that the defendant is competent to stand trial . . . "[2] Meanwhile, on February 25, 1977, the prosecution sought to amend the information in order to charge the defendant with illegally possessing a firearm. The motion to amend was denied by the trial court.

> I have heard enough testimony from psychiatrists that sometimes a person may be very mentally ill at times, may act rationally, but I am talking about referring this man for psychiatric evaluation against his will, and over his objection, and forcing a defense on him which he is not willing to accept to defend himself . . . I am very reluctant on this evidence, as I said, bearing in mind it is his defense and he is before me in opposition to the motion, knowingly and understandably, he is waiving it. And I am not going to force it on him.

Trial took place from March 7 to March 10, 1977. At its conclusion, the jury returned a verdict of guilty. After Felix was sentenced, the defense counsel moved for a new trial and sought a directive that the defendant undergo a psychiatric examination. The trial judge denied the new trial motion, but directed the Commissioner of Public Safety to refer the defendant to the Commissioner of Health or his representative for observation and testing in the correctional facility where he was incarcerated.[3]

The shooting that gave rise to this proceeding took place near the Bridge Bar on the island of St. Thomas. The prosecution's theory was that Felix shot Industrious without provocation, and that Felix then removed a second gun from his trousers and placed it beside Industrious in order to make it appear as though he shot Industrious in self-defense. In response, the defense maintained that Felix, after approaching Industrious, discovered that Industrious had a pistol in his waistband, asked if Industrious had a license for it, and after Industrious went for his gun, shot him in self-defense.

### B.

█ Felix argues, *first*, that the trial judge abused his discretion in refusing, during the *voir dire*, to ask each member of the panel to state whether he or she was from the island of Tortola, which is part of the British Virgin Islands. Defense counsel based his request for such an inquiry on the argument that since the deceased was a native of Tortola, whereas the defendant was a native of the United States Virgin Islands, a member of the jury who hailed from Tortola and was a naturalized American citizen could be expected to display

toward the defendant the prejudice that is commonly found to exist between so-called "down-islanders"—those from the British, French and Dutch islands of the Antilles—and native United States Virgin Islanders.[4]

The trial judge declined during the *voir dire* to ask each member of the venire whether he or she had come from Tortola. Instead, the judge asked the members of the panel whether their judgment regarding the guilt or innocence of the accused would be affected by the fact that the defendant was a native of the U. S. Virgin Islands. He said:

> As adults we know that we do have certain prejudices, certain biases, they are for or against a thing or for or against a person or for or against certain types of persons, or persons holding certain status . . . I mention this so that if, in the event we are faced with one of these evidentiary situations in which a citizen shot and killed a noncitizen, as alleged, that the status of the citizenship or alienage would not affect anybody's judgment. *If then, if either because you are a U.S. citizen or because you are a U.S. citizen by naturalization or you lived in any of these neighboring islands, you think that the difference in the status between the deceased, a Tortolian, if that's what it turns out to be, and the defendant, a St. Thomian, if this in any way will affect your judgment in the slightest degree, please raise your card.* (emphasis added)

█ On appeal, Felix declares that the inquiry by the trial court was insufficient, for it is "unrealistic" to expect members of the venire to raise their cards when asked if they are potentially biased against a defendant because they had been born or had

---

**3.** The record does not indicate the consequence of any psychiatric testing of Felix that occurred in the penitentiary. In his brief, the appellant's counsel asserts that the defendant had advised him that there had been one psychiatric examination. Counsel also states that he has not obtained any information regarding the results of such examination.

**4.** More specifically, Felix claims that because natives of the U. S. Virgin Islands harbor a bias against "down-islanders," it "requires little imagination to visualize the negative and defensive attitude" that such hostility must have generated in the minds of Tortolans toward those like the defendant who were born in the U. S. Virgin Islands.

lived in a different location. The court's failure to inquire specifically whether the members of the venire had come from Tortola, Felix urges, deprived him of a basis for exercising his right to make peremptory challenges for cause to members of the jury panel.[5]

There are several difficulties with this argument. First, the factual underpinning of Felix' contention has not been established.[6] In addition, Felix has pointed to no authority which indicates, or even suggests, that in a case such as this the trial court should have inquired about the prior residence of the members of the panel.

At oral argument, defense counsel identified as his "strongest" authority *United States v. Segal*, 534 F.2d 578 (3d Cir. 1976). But *Segal* is distinguishable from the present situation. *Segal* involved a prosecution for bribery of a public official which arose out of an alleged payment of money by Segal to an agent of the Internal Revenue Service. It was known by the parties that a number of those in the venire had been employed by the government. In such circumstances, the defense counsel asked

that the trial court, in conducting the *voir dire*,[7] inquire whether any member of the jury panel, or of his family, had ever been employed by the IRS. The court honored this request, noting that the information was germane because there was a "possibility of lingering loyalty to the service, friendship of persons still employed there, or knowledge of agency procedures . . . " 534 F.2d at 581.

The character of the alleged prejudice that was of concern in *Segal* is, by its very nature, rather particularized and concrete, for it involves the question of the specific employer of a member of the jury panel. In contrast, the alleged bias of which the defense counsel here complained is unfocused and diffuse, for it is said to be relevant to a large portion of the population of the Virgin Islands. Indeed, the prejudice claimed to exist by the defendant is so highly general that it could arguably obtain, if one accepts the unproven factual premise of the defense argument, in almost any sort of case arising in the Virgin Islands. Clearly the *Segal* Court did not conceive of its ruling as reaching so broadly,

---

5. The essential function of the voir dire is to allow the prosecution and defense "to object to individual jurors either peremptorily or for cause. Challenges for cause are subject to approval by the court and must be based on a finding of actual or implied bias. Peremptory challenges may be exercised in limited number without giving reasons and at the sole discretion of the prosecution of defense." Note, *Limiting the Peremptory Challenge: Representation of Groups on Petit Juries*, 86 Yale L.J. 1715, 1717–1718 (1977). The defense counsel's position in the present case is that, because the court did not ask whether the members of the panel came from Tortola, he had no adequate factual foundation on which to base a challenge—whether it be peremptory or for cause—to the panel members.

6. During oral argument, a number of concessions were made that tend to weaken the factual basis of defendant's argument. For instance, it was admitted that a large number of persons travel to the U. S. Virgin Islands and become naturalized citizens there. However, despite the large number of persons involved, the defense counsel did not distinguish between those naturalized citizens who harbor prejudice against native American citizens, and those who do not. Rather, he asserted in effect that

all Virgin Islanders who are not native U. S. Virgin Islanders may be assumed to harbor prejudice against native U. S. Virgin Islanders.

Moreover, it was agreed that no record of such prejudice was developed before the trial court. Defense counsel declared that such a record was unnecessary, for the reality of pervasive prejudice of the sort he described was indisputable. Counsel insisted that the "fact" of such bias was one of which the trial court could have taken judicial notice. Nevertheless, there is no indication that the counsel ever asked the court to take judicial notice of such a "fact", or that any evidence was presented by the defense to buttress its assertion of fundamental hostility between native-born citizens and those citizens who were not native-born, once it became clear that the trial court opposed the position advanced by the defense.

7. As the court in *Segal* noted, a trial judge may conduct the *voir dire*, and when he does so, he generally has wide discretion in determining its scope. However, " . . . the parties have the right to some surface information about prospective jurors which might furnish the basis for an intelligent exercise of peremptory challenges or motions to strike for cause based on a lack of impartiality." 534 F.2d at 581.

for it was careful to confine its holding to the circumstances of that case.[8]

Further, there is a strong policy reason for not holding that the trial court abused its discretion in the present case by refusing to ask each member of the venire about his or her prior place of residence. Such an investigation, carried out in a highly visible criminal trial on the island of St. Thomas, could reasonably be expected to foster polarization in the community. In effect, it could be perceived as representing an official endorsement of the notion that there is deep intolerance between those who are nativeborn citizens and those who are not.[9]

After weighing these factors, we have concluded that the trial court did not abuse its discretion in refusing to ask the jury panel whether any member of it had come from Tortola.

*Second,* Felix maintains that the trial court erred in allowing testimony regarding two subjects collateral to the crime charged in the information: (a) the possession by Felix of a pistol in possible violation of restrictions that had been placed on his license to carry a gun; and (b) an altercation between Felix and Michael Nixon earlier on the day of the shooting of Industrious.

As to the firearm license restriction and its possible violation, in a pretrial discussion with counsel the district court asserted that it would refuse to receive evidence on the subject. At that time the court said that the probative worth of the proffered testimony was outweighed by the prejudice that might result from admitting it. However, at trial, the judge allowed the government to cross-examine Felix about the restrictive firearm license on the ground that, in his direct testimony, Felix had stated that he was acting as a police officer on the occasion of the shooting.[10]

Counsel for the defendant objected, claiming that the prejudice of such cross-examination would outweigh any probative value of information "that will be brought out by the fact that the gun was not licensed to carry." (sic) The court ruled that it would permit the cross-examination, and that it would caution the jury that "the only purpose for which they may consider whether he was licensed to carry the gun or not would be in connection with his statement that he stated he was a correction officer and with respect to that impression that he was acting officially."[11]

---

**8.** Other cases cited by Felix dealing with challenges to members of the jury panel are also distinguishable, for they do not involve the sort of broadscale potential for partiality that the defense asserts here. For instance, in *Government of Virgin Islands v. Bodle*, 427 F.2d 532 (3d Cir. 1970), involving a prosecution for rape, the court held that the presence on the jury of a person with a sister who had been a victim of forcible rape and murder created a substantial possibility that he was not capable of making an objective determination of the facts of the case. *See* 427 F.2d at 534. *Cf. Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975) (holding that a criminal defendant has a constitutional right to a jury selected from a representative cross-section of the community).

**9.** The danger of such fragmentation between social groups cannot reasonably be said to result, for instance, when a trial court merely inquires into the employment background of potential jurors.

Moreover, the question that the trial judge in the present case addressed to the panel at the *voir dire* was carefully calibrated to avoid such polarization, and yet ascertain the critical issue

whether any jurors would be biased by a difference in place of birth.

**10.** In his direct examination, Felix testified that when he approached the deceased, he " . . . pulled my hand around like a friendly kind of thing, saying hello, but in doing that, then I felt this pistol on the side." Then, said Felix, he asked Industrious if he had a license to carry the pistol. When Industrious indicated that he did not: " . . . I said, I am a correction officer, you are under arrest." At that point, in his testimony, Felix recounted that Industrious rushed at him and grabbed him, and that in self-defense he shot Industrious.

**11.** On cross-examination, Felix was asked about the restriction on his license. The following colloquy occurred:

Q. What type of license were you in possession of on December 24th of last year when this incident occurred? . . .
A. The license was signed by Detective Griffith for home protection.
Q. For home protection. Was it what you call a restrictive license?

. . . . .

A. Yes, I'll say partially.

In regard to the altercation with Nixon, Felix insists that the government, during his cross-examination, was allowed by the court to probe in greater depth than it should have been permitted to do. Defense counsel conceded that it was he, not the prosecution, who had raised the Nixon matter at trial. However, defense counsel argues that even though he had initiated discussion of the subject, the government proceeded much further in its cross-examination of Felix on the subject than the defense went in its direct examination, and thus the defense's objection to the cross-examination, based upon its prejudicial character, should have been sustained.[12]

■ Appellant's contentions with respect both to the firearm restriction and the Nixon altercation rest on the notion that such evidence constituted inadmissible testimony about possible crimes, albeit minor offenses, unrelated to the one on which the defendant was being tried. The starting point for analyzing that claim is the observation of this Court that " . . . the exclusion of such evidence has become the exception to the general rule permitting the admission of evidence of other crimes if it is relevant

Q. What was the restriction?
A. It stated home protection.
Q. For home protection. What *does* that mean in your mind?
A. Anything that is connected with my home, that will be permissible to use it, I guess that's what it means.
Q. It means, then, you were permitted to keep it at home.
A. Yes.
Q. It does not mean that you may carry it, isn't that so?
A. The Commissioner himself told me that I should . . .
Q. . . . Did you realize you were running a risk by violating the law, carrying it contrary to the restrictions, yes or no, did you know you were?
A. Yes.
Q. And you did it anyhow . . .
A. I carried the gun, yes, sir, I carry it all the time.
Q. Contrary to the restrictions? Yes or no.
A. Yes.

When charging the jury, the judge stated that the defendant "is not on trial for having carried without proper authorization a firearm on his person. Whatever else the evidence may show he may have done that you consider wrong, he is not on trial for that."

12. The defense counsel put Michael Nixon on the witness stand, and asked him to state his height. Then the defense called Felix, and the following exchange occurred:

Q. Now, some time in the early afternoon of that day, did you have an incident with anyone?
A. Yes, sir.
Q. With whom did you have the incident?
A. Michael Nixon.
Q. Was that the same man that just came into the box a few minutes ago?
A. Yes, sir.

Q. Was Thomas Wellington Industrious involved in that incident that you speak of in any way?
A. No, sir.
Q. Was he present, to your knowledge?
A. No, sir.

.    .    .    .    .

Q. All right, did Thomas Industrious look anything like Michael Nixon?
A. No, sir.
Q. Did you have any chance of mistaking one for the other?
A. No, sir.

On cross-examination, Felix was asked, over his counsel's objection, to describe the altercation with Nixon. Felix gave the following description:

Well, the incident was over a domino game, really, and it was a domino game involving playing for money. And the involvement was this, prior to this date, me and Michael Nixon was actually engaged in a previous domino game which he owed me four dollars. And after that game started I asked him for the four dollars that he owed me and indirectly he refused to pay me. So the game was coming to a close anyway, and it happened so I won the game, so he had to pay me. In paying me, he gave me a ten dollar bill, and out of the ten dollar bill I gave him back four dollars change, and this got him mad . . . Before I even got up he swung on me. So I got up and swung on him. He came headlong at me and I started throwing punches to him, too. At that particular time my pistol was on my left side, and it was falling out and I held it in my hand. After he saw this pistol in my hand, he said, okay, and the fight was over there. He went his way and I went mine.

After Felix testified, the government recalled Michael Nixon, and asked him about his conflict with Felix; and it called two other witnesses, Moleto Turnbull and Dennis Donovan, who were requested to give their eyewitness accounts of the controversy.

to a material issue at trial." *United States v. Cook*, 538 F.2d 1000, 1003 (3d Cir. 1976). What is required in order to permit testimony about other crimes, first of all, is that it be "relevant for any purpose other than to show a mere propensity or disposition on the part of the defendant to commit the crime." *United States v. Stirone*, 262 F.2d 571, 576–577 (3d Cir.), *rev'd on other grounds*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960).

In addition, even when an item of evidence is relevant, Rule 403 of the Federal Rules of Evidence provides that:

> . . . evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . .

And the Advisory Committee's Note to Rule 403 states:

> Situations in this area call for balancing the probative value of and need for the evidence against the harm likely to result from its admission.

Pursuant to those provisions, this Court has held that when a Rule 403 problem arises, the trial court should carefully weigh the probative value of the proffered testimony against its possible prejudicial effects.[13]

■ In applying these principles to the admission of the testimony about the firearm restriction, we find no reversible error on the part of the trial court. Felix testified that he had identified himself to Industrious as a corrections officer, thus raising the issue whether he was acting in an official role. The nature of his firearm restriction does appear to be of relevance to the question of Felix' alleged action in an official capacity.[14]

Further, it cannot be said on the basis of the record that the trial judge did not balance the probative value of such testimony against the potential prejudice flowing from it. At a pretrial conference where the judge ruled against the admission of the testimony regarding the firearm license, the court specifically took account of its possible prejudicial effect as compared with its probative weight. And at a conference with counsel during trial, after Felix testified that he had acted in an official capacity in his dealings with Industrious, the trial court expressed renewed concern about the possible untoward consequences of admitting testimony about the firearm restriction. In such circumstances, we cannot conclude that the trial court abused its discretion in weighing the probative value against the prejudicial effects of such evidence.

■ The admission of testimony about the details of the Nixon controversy presents a somewhat closer question, although after carefully reviewing the record before us, again we cannot conclude that the trial court committed reversible error. In the first place, in the pre-trial conference, the court directly warned the defense counsel about introducing testimony relating to the Nixon dispute and thus opening it up to inquiry by the prosecution.[15] Yet, the defense counsel went ahead despite the

---

**13.** *See United States v. Cook*, 538 F.2d 1000, 1004 (3d Cir. 1976): "This balancing test is the modern bastion of a long standing tradition that protects a criminal defendant from 'guilt by reputation' and from 'unnecessary prejudice.' Because the weighing entails competing interests, it is delicate, and must be employed with care lest accommodation to the prosecutor's needs result in subverting a principle that is central to our concept of fairness."

**14.** Admittedly, this evidence is of limited probative value. Yet, its prejudicial impact is restricted as well.

**15.** In the pre-trial conference, the prosecution remarked that it had no intention of offering evidence on the Nixon conflict, or of alluding to

it. The defense counsel stated that he did not expect to introduce such evidence, although he indicated that he might decide to do so at trial. Then the following exchange occurred between the defense counsel, Mr. Stout, and the court:

> Mr. Stout: Frankly, what I thought of, if I were to ask him, did you have any previous incident that day, and he said yes, then I asked him if Mr. Industrious was involved in any of them in any way, you know.
>
> The Court: You can do that, however you wish, *but you know sometimes witnesses go beyond a question. If he opens*—
>
> Mr. Stout: *I am well aware of that.* (emphasis added)

warning by the trial judge and introduced evidence about the altercation.[16]

Moreover, in answering his counsel's questions, Felix may be said to have raised an issue about his own credibility, for his testimony could be construed as indicating that it was a minor matter. The contrary testimony about the argument elicited by the prosecution thus was relevant to the question of the defendant's credibility.

■ Also, it should be noted that the trial court gave a limiting instruction to the jury [17] regarding the Nixon dispute.[18] And it appears from the record as a whole that the trial court did compare the possible prejudicial impact of the testimony with its probative value.

Thus, in light of the discretion of a trial court in ruling on matters of evidence,[19] we cannot in this case find a basis for determining that the court abused its discretion in admitting the evidence in question about the conflict between Felix and Nixon on the day of the shooting.[20]

■ *Third*, Felix argues that the government's pre-trial motion for a psychiatric examination should have been granted, even though the defense opposed the motion at the time it was made. Further, even if the district judge did not commit reversible error by declining to grant the government's motion, the appellant contends, the judge did err in failing to order a complete psychiatric and neurological examination of Felix in connection with the defendant's post-trial motion for a new trial.

One of the fundamental postulates of our system of criminal justice is that a defendant be competent to stand trial.[21] The question of a defendant's sanity at the time of the commission of a crime, moreover, is a serious one that must not be handled incautiously. Nevertheless, it is rather inexplicable as an analytical matter for the defense to maintain on appeal that, because there was a risk of the defendant's incompetency or insanity, the government's pre-trial motion for a psychiatric examination should have been granted—when, in fact, the de-

---

16. See *United States v. Bolin*, 514 F.2d 554, 558 (7th Cir. 1975) ("When a party opens up a subject, even though it may not be strictly relevant to the case, he cannot complain on appeal if the opposing party introduces evidence on the same subject.")

17. A court should take into account, when confronted with the possibility of prejudice from the admission of evidence, the "probable effectiveness or lack of effectiveness of a limiting instruction." *See* Advisory Committee's Note to Rule 403, Fed.R.Evid.

18. The trial court said: "You were allowed to hear quite a bit of testimony regarding Mr. Nixon's incident . . . This was permitted only because the *defendant* had said there had been an incident between them, he had given his version of the incident, and the Government chose to call a witness to testify as to a different version . . . It was only offered so that you will put it on the scales in determining believability . . . *But under no circumstances can you even contemplate anything along the lines of saying, well, he used his gun against Nixon, so he probably used it wrongly against Industrious also.*" (emphasis added).

19. *Cf. United States v. Cepulonis*, 530 F.2d 238, 246 (1st Cir. 1976).

20. This is not to say that the trial court would have acted impermissibly had it taken steps sooner to halt the probing by the prosecution into the Nixon affair. Indeed, such limitation might have been preferable. In any event, the role of an appellate tribunal at this stage of the proceedings is not to decide what might have been done in the first instance, but is rather to determine whether there was an abuse of discretion on the part of the trial court in admitting the testimony about the Nixon altercation. On the record before us, we cannot answer that question in the affirmative.

The appellant's contentions regarding other evidentiary rulings by the trial court similarly do not warrant reversal. For example, Felix objects to the admission of testimony by a patrolman to the effect that, earlier on the day of the shooting, the defendant had said to him that "I feel like killing somebody." Felix asserts merely that this statement has no probative worth and is highly prejudicial—although it would appear to be quite probative to the prosecution's case. The same bald assertion is made regarding the admission of testimony by the brother of the deceased that he had never known the deceased to have a gun. Once again, the claim of Felix, without more, appears unfounded.

21. *See U. S. A. v. Hollis*, 3 Cir., 569 F.2d 199 (1977).

fense vigorously opposed that motion at the time it was entered, and maintained its opposition throughout a hearing on the motion.[22]

Also, up until the time that the defendant filed his post-trial motion regarding a psychiatric examination, there was no evidence in the record to suggest that Felix was mentally incompetent either at the time of the crime or of trial. And the only support for the post-trial motion itself was an affidavit, dated March 21, 1977, signed by the defendant's attorney. The affidavit states in effect that the attorney had discovered no motive for the killing of Industrious, and that because of this, there is a reasonable basis to believe that the defendant might have been mentally ill at the time of the shooting.

The fundamental weakness of the affidavit is that it does not point to any specific evidence of mental incapacity or illness. It recounts in a summary fashion, *inter alia*, the defendant's criminal record, his history of disciplinary difficulties as a Corrections Officer with the Department of Public Safety, his appearance of excitation in conferences with counsel, his "obsession" with Gary Gilmore, a convicted killer who while imprisoned in Utah sought his own electrocution, the apparent opinion of a psychiatrist (who did not examine Felix) that the killing of Industrious might have been caused by mental illness, and the embarrassment of counsel when his client engaged in a lengthy "diatribe" in court during the sentencing proceedings. None of these points involves definite medical or psychiatric testimony from one who is pro-

fessionally qualified to pass judgment on the matter in question, and who personally examined the defendant.

On the basis of the record before us, then, we cannot conclude that the trial court erred in refusing to order a psychiatric examination of Felix.[23]

*Fourth*, Felix questions the sufficiency of the evidence supporting the verdict of guilty for first degree murder. We are unable to agree with this final defense contention. As this court wrote in *Government of Virgin Islands v. Lake*, 362 F.2d 770, 776 (3d Cir. (1966)), *cited with approval in Government of the Virgin Islands v. Lanclos*, 477 F.2d 603, 606 (3d Cir. 1973), regarding the standard of proof required to support a verdict of willful, premeditated and deliberate killing:

> To premeditate a killing is to conceive the design or plan to kill . . . A deliberate killing is one which has been planned and reflected upon by the accused and is committed in a cool state of the blood, not in sudden passion engendered by just cause of provocation . . . It is not required, however, that the accused shall have brooded over his plan to kill or entertained it for any considerable period of time. *Although the mental processes involved must take place prior to the killing, a brief moment of thought may be sufficient to form a fixed deliberate design to kill . . .* (emphasis added)

Although the defense maintains that there is no evidence affirmatively demonstrating that Felix did have a design to kill for an extended period of time prior to the shoot-

**22.** The defense attorney in a sense concedes this point, saying in his brief that the argument puts him in an "embarrassing position." Yet, the defense proceeds to make the contention anyway. The practical explanation for such action was provided during oral argument before this Court, when the defense attorney noted that at trial he had found himself in a difficult position because his client had requested that he oppose the government's motion, while he apparently had at least some doubt about the propriety of so doing. Nonetheless, such doubt was overcome in light of the client's wishes, and an unequivocal objection to the

government's pre-trial motion was formally entered by the defense.

**23.** Our conclusion should not be taken as a final ruling on the issue of Felix' competence or mental capacity at the time of the shooting or at trial—for we are only called on to pass upon the actions of the district court, in which we find no error, and the record before us includes no evidence regarding the results of the examination of Felix in prison. Thus, our decision is without prejudice to the defense to seek *habeas* relief in the event that evidence of mental incompetency arises from any such examination.

ing of Industrious, this point does not rule out the possibility that a jury could find that the killing was premeditated and deliberate.

In the context of the present situation—in particular, of the evidence regarding the shooting of Industrious; the testimony that Felix had two guns with him at the time of the shooting, which he did not explain; the fact that, despite the nature of his firearm license, he was carrying a gun on the occasion of the shooting; the fact that Felix had had a violent altercation with Nixon earlier on the day of the shooting; and the testimony that Felix had stated on the day of the shooting that he felt like killing somebody—we cannot hold that there is insufficient evidence in support of the verdict.

### C.

Since we have discerned no basis for concluding that there was reversible error in regard to the contentions raised by the appellant, the judgment of the district court will be affirmed.