Rowland **CORDERO**, Appellant,

v.

**UNITED STATES**, Appellee.

No. 80–594.

District of Columbia Court of Appeals.

Argued Dec. 2, 1981.

Decided Jan. 31, 1983.

---

**5.** I share the views expressed by Judge Ferren in Part II of his separate opinion.

Russell F. Canan, Washington, D.C., for appellant.

Michael D. Hays, Asst. U.S. Atty., Washington, D.C., with whom Charles F.C. Ruff, U.S. Atty. at the time the brief was filed, and John A. Terry, Asst. U.S. Atty. at the time the brief was filed, and Michael W. Farrell and A. Carlos Correa, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before KERN, FERREN and BELSON, Associate Judges.

FERREN, Associate Judge:

██ The principal question in this case is whether the trial court erroneously refused to raise certain matters during *voir dire* of the jury panel. We conclude that the trial court abused its discretion by failing either (1) to outline the facts alleged, followed by a specific inquiry as to whether the prospec-

tive jurors felt any prejudice toward appellant because of his political views or affiliations, or at least (2) to alert the prospective jurors to the political issues involved and then to inquire, more generally, whether they could be impartial. We therefore reverse appellant's conviction and remand for a new trial.

## I.

Appellant was charged with disrupting Congress. D.C.Code 1973, §§ 9–123(b)(4), –124 (recodified as D.C.Code 1981, §§ 9–112(b)(4), –113).[1] His counsel proposed 38 *voir dire* questions, which the trial court rejected, including questions that would have probed the potential jurors' attitudes toward someone who had made a speech denouncing the United States for "planning World War III" and who was a member of Vietnam Veterans Against the War and the Revolutionary Communist Party.

In conducting *voir dire,* pursuant to Super.Ct.Crim.R. 24, the court said it was following its "regular" procedure. The court told the prospective jurors that appellant was charged with "Disrupting Congress in that he uttered loud language in Senate Gallery No. 8, disturbing the orderly conduct of a session of Congress." The court then asked the prospective jurors: (1) whether any of them had heard or read anything about the incident charged; (2) whether any of them recognized appellant, the attorneys, or the witnesses; (3) whether

any of them or any of their close relatives had ever been charged with, the victim of, or witness to a "disturbing the peace type" offense; (4) whether any of them or any of their close relatives had ever done "law enforcement work" or been a member of a "law enforcement agency" in the District of Columbia area; (5) whether any of them would be inclined to give greater or lesser weight to the testimony of a police officer than to the testimony of any other witness; (6) whether any of them had ever served on a grand jury; (7) whether any of them had ever had "legal training"; and (8) whether any of them had "any feeling other than complete neutrality" about the case or knew of any reason why he or she could not "render a fair and impartial verdict based solely on the law and the evidence."

Only two of these questions provoked responses from prospective jurors: five members of the panel answered that they or their relatives had done "law enforcement work" (two in the CIA, two in the Metropolitan Police Department, and one in the National Guard), and three members stated that they had some "legal training." The prospective jurors who had relatives on the police force and those who had received legal training were removed by peremptory challenges.

At trial, the government presented two witnesses. Officer Gilbert Mayo of the Capitol Police testified that on May 2, 1979,

---

1. D.C.Code 1973, § 9–123(b)(4) provides:

 Unlawful conduct on Capitol Grounds or in buildings.

 . . . .

 (b) It shall be unlawful for any person or group of persons willfully and knowingly—

 . . . .

 (4) to utter loud, threatening, or abusive language, or to engage in any disorderly or disruptive conduct, at any place upon the United States Capitol Grounds or within any of the Capitol buildings with intent to impede, disrupt, or disturb the orderly conduct of any session of the Congress or either House thereof, or the orderly conduct within any such building of any hearing before, or any deliberations of, any committee or subcommittee of the Congress or either House thereof;

 D.C.Code 1973, § 9–124 provides:

 Parades or assemblages and displays forbidden in Capitol Grounds.

 It is forbidden to parade, stand, or move in processions or assemblages in said United States Capitol Grounds, or to display therein any flag, banner, or device designed or adapted to bring into public notice any party, organization, or movement, except as hereinafter provided in sections 9–128 and 9–129.

 The information wrongly stated that appellant was charged with violating 9 U.S.C. §§ 123(b)(4) and 124. Because appellant never has claimed that he suffered prejudice attributable to this error, it cannot be grounds for reversal of his conviction. Super.Ct.Crim.R. 7(c).

he was on duty in the Senate gallery watching the Senate conduct "routine business" when he heard someone in the gallery give a "scream-type yell." Mayo turned and saw that appellant had risen from his seat, was "shouting toward the floor of the Senate" about "the third world war," "revolution," and "the killing of people in Vietnam," and was throwing leaflets into the air. Mayo could not recall appellant's exact words, but he remembered that they were "basically the same" as the written statements in appellant's leaflet. That leaflet, which was necessary, first, to refresh Mayo's recollection, was entered into evidence, and reviewed by the jury, as Government Exhibit 1. It read as follows:

> We are supposed to be awed by the spectacle before us. "Our leaders" taking care of "our business." Just another damn lie.
>
> These millionaires are getting ready for World War III. These monstrous animals who tried to bomb the Vietnamese into the stone age, who tortured mercilessly and committed countless atrocities world-wide from Iran to Chile, these profit hungry vampires who walk around in three piece suits and call themselves polite names like statesman, businessmen, and general don't care how many hundreds of millions of people are incinerated.
>
> Their system is driving them to war. They want the slaves here to go fight the slaves in Russia to see which master can have the biggest empire on earth. Bringing back the draft is part of that.
>
> To hell with them. People we got to make it a revoluntionary civil war against them. Follow the leadership of the Revolutionary Communist Party and be determined to make revolution to end this system of misery.
>
> In Vietnam they put guns in our hands and had us kill—but a lot of those guns got turned on the officers. The slaves of this world have but one enemy and that is the capitalists, the oppressors.

Mayo testified that the people around appellant seemed "frightened" and attempted to move away. Mayo stated, over appellant's objection on hearsay grounds, that as he moved to arrest appellant the President pro tem of the Senate pounded the gavel several times and called for the Sergeant at Arms to restore order in the Senate and in the gallery. Mayo arrested appellant and escorted him from the gallery.

Capitol Police Officer John Mitchell, who also was on duty in the Senate gallery at the time, gave testimony corroborating Mayo's account of the incident, including identification of appellant's leaflet.

Appellant's defense was that he lacked the required specific intent to disrupt Congress (see note 1 *supra*) since he had intended only to speak to the people in the gallery itself, not to the Senators. Appellant testified over government objection that he was a Vietnam veteran and that he had joined the Vietnam Veterans Against the War, the Revolutionary Union, and the Revolutionary Communist Party after his discharge from the Army.[2] Appellant stated that he had come to Washington a few days before his arrest to participate in the May 1, 1979, International Workers' Day Celebration. He visited the Senate gallery the day before he was arrested and decided that he "wanted to speak to the American people, the people of the gallery, and make a statement about World War III." He prepared a leaflet and returned the next day. Appellant admitted that he "made [his] statement," that he knew the Senate was in session when he did so, and that he "didn't care if the Senators heard."

The jury found appellant guilty of disrupting Congress; the trial court sentenced him to 30 days' imprisonment and fined him $300. The court suspended execution of the sentence and continued the case for 30 days

**2.** In objecting, the government called his testimony "irrelevant"—a frivolous point in view of the government's introduction of appellant's political leaflet into evidence, buttressed by the corroborating testimony of Officers Mayo and Mitchell.

for payment of the fine or, if the fine were not paid, for appellant to serve 30 days in lieu of paying the fine.

## II.

Appellant contends that the trial court violated his Sixth Amendment right to trial by an impartial jury by refusing to ask the members of the jury panel whether any of them had ever worked in a prosecutor's office, whether any of them would find it difficult to apply legal rules regarding presumption of innocence, reasonable doubt, and burden of proof, and whether any of them would be prejudiced against appellant because of his political beliefs or affiliations.

■ A. "The law affords the trial court broad discretion in conducting *voir dire* examination; absent an abuse of discretion and substantial prejudice to the accused, the trial court will be upheld." *Khaalis v. United States,* D.C.App., 408 A.2d 313, 335 (1979), *cert. denied,* 444 U.S. 1092, 100 S.Ct. 1059, 62 L.Ed.2d 781 (1980). The trial court did not abuse its discretion in refusing to ask the jury panel whether any of them had ever worked in a prosecutor's office, for the court covered this question in substance when it asked the prospective jurors whether any of them had done "law enforcement work" or had received "legal training." *See United States v. Cockerham,* 155 U.S.App.D.C. 97, 476 F.2d 542 (1973) (per curiam); *United States v. McDonnell,* 573 F.2d 165, 166 (3d Cir.1978) (per curiam) (no error where *voir dire* questions "address[ed] substantially the same issues raised in those submitted by counsel").

■ B. Nor did the court abuse its discretion in refusing to ask members of the jury panel whether they would be able to apply the law regarding presumption of innocence, reasonable doubt, and the government's burden of proof. These proposed questions concerned propositions of law. We held in *Davis v. United States,* D.C.App., 315 A.2d 157, 160 (1974), that a trial court properly declined to allow a *voir dire* question which "inquired respecting a proposition of law and hence invaded the function of the trial judge." Once jurors are sworn, they are "bound to render a verdict under the law as given by the court," and "[a]ccordingly, it is not necessary to inquire as to whether a juror will refuse to do that which he swears or affirms he will do." *United States v. Wooton,* 518 F.2d 943, 946 (3d Cir.), *cert. denied,* 423 U.S. 895, 96 S.Ct. 196, 46 L.Ed.2d 128 (1975); *United States v. Price,* 577 F.2d 1356 (9th Cir.1978), *cert. denied,* 439 U.S. 1068, 99 S.Ct. 835, 59 L.Ed.2d 33 (1979).[3]

■ C. Appellant's final argument—that the trial court abused its discretion in refusing to ask questions directed at determining whether prospective jurors would be prejudiced against appellant because of his political views or affiliations—presents a more difficult problem. The trial court's broad discretion is limited by "the essential demands of fairness." *Aldridge v. United States,* 283 U.S. 308, 310, 51 S.Ct. 470, 471, 75 L.Ed. 1054 (1931); *accord Evans v. United States,* D.C.App., 392 A.2d 1015, 1025 (1978); *United States v. Robinson,* 154 U.S. App.D.C. 265, 269, 475 F.2d 376, 380 (1973). We conclude that the *voir dire* examination at appellant's trial failed to satisfy those demands.

■ Fairness requires a careful *voir dire* examination when there is a "significant likelihood" of juror prejudice. *Ristaino v. Ross,* 424 U.S. 589, 598, 96 S.Ct. 1017, 1022, 47 L.Ed.2d 258 (1976); *see United States v. Dellinger,* 472 F.2d 340, 368 (7th Cir.1972), *cert. denied,* 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973) ("At a minimum, when requested by counsel, inquiry

---

**3.** Appellant urges us to follow *United States v. Blount,* 479 F.2d 650 (6th Cir.1973), by holding that a trial court commits reversible error if it refuses to ask prospective jurors whether "they could accept the proposition[s] of law" relating

to presumption of innocence, reasonable doubt, and burden of proof. *Id.* at 651. We do not find *Blount* persuasive and, in any event, are precluded from adopting it in light of *Davis, supra,* as binding precedent.

must be made into matters where the likelihood of prejudice is so great that not to inquire would risk failure in assembling an impartial jury.") A significant likelihood of prejudice exists when (1) a case involves "matters concerning which either the local community or the population at large is commonly known to harbor strong feelings," *Robinson, supra* at 270, 475 F.2d at 381, and (2) these matters are "inextricably bound up with the conduct of the trial." *Rosales-Lopez v. United States,* 451 U.S. 182, 189, 101 S.Ct. 1629, 1634, 68 L.Ed.2d 22 (1981) (plurality opinion) (quoting *Ristaino, supra* at 597, 96 S.Ct. at 1021); *see Ham v. South Carolina,* 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973) (failure to inquire into racial prejudice where black defendant's defense to drug possession charge was that he had been framed in retaliation for his civil rights activities).

■ Courts have held that controversial matters requiring careful inquiry include race,[4] religion,[5] abortion,[6] nationality or alienage,[7] insanity,[8] sexuality,[9] drug-related crimes,[10] and political attitudes.[11] In cases where such controversial matters are inextricably linked to the trial, courts have found various ways to minimize the likelihood of prejudice. Some have stated the factual outline of the case to the prospective jurors in sufficient detail that the controversial issue became evident, and then, at the close of *voir dire,* asked in effect: "Is there any reason why you cannot be impartial in this case?"[12]

4. *Ham, supra; United States v. Bear Runner,* 502 F.2d 908 (1974).

5. *Casey v. Roman Catholic Archbishop of Baltimore,* 217 Md. 595, 604, 143 A.2d 627, 631 (1958); *cf. United States v. Ible,* 630 F.2d 389, 394–95 (5th Cir.1980) ("While we do not need to decide whether this failure [to ask a *voir dire* question concerning prospective jurors' moral or religious beliefs about alcohol] was reversible error, ... the court views this action by the trial court with grave concern.... [T]his was a very appropriate area for inquiry by counsel and it is expected that such inquiry will be conducted on retrial" (citations omitted)).

6. *People v. Murawski,* 2 Ill.2d 143, 146, 117 N.E.2d 88, 90 (1954); *Wasy v. Indiana,* 234 Ind. 52, 55, 123 N.E.2d 462, 464 (1955) (religious views on abortion); *State v. Barnett,* 251 Or. 234, 236, 445 P.2d 124, 125 (1958) (same).

7. *Kuzniak v. Taylor Supply Co.,* 471 F.2d 702 (6th Cir.1972).

8. *State v. Olson,* 156 Mont. 339, 344, 480 P.2d 822, 825 (1971); *State v. Sanders,* 242 S.E.2d 554, 557–58 (W.Va.1978).

9. *State v. Murray,* 375 So.2d 80, 83 (La.1979) (homosexuality of complaining witness).

10. *State v. Conrad,* 304 So.2d 318, 319 (La. 1974).

11. *Morford v. United States,* 339 U.S. 258, 70 S.Ct. 586, 94 L.Ed. 815 (1950); *Dellinger, supra* at 366–70. *But see Connors v. United States,* 158 U.S. 408, 15 S.Ct. 951, 39 L.Ed. 1033 (1895); *United States v. Workman,* 454 F.2d 1124, 1128–29 (9th Cir.), *cert. denied,* 409 U.S. 857, 93 S.Ct. 138, 34 L.Ed.2d 102 (1972).

12. *United States v. Furey,* 491 F.Supp. 1048, 1054–55 (E.D.Pa.) (political attitudes), *aff'd,* 636 F.2d 1211 (3d Cir.1980), *cert. denied,* 451 U.S. 913, 101 S.Ct. 1987, 68 L.Ed.2d 304 (1981); *Commonwealth v. Harrison,* 368 Mass. 366, 369–72, 331 N.E.2d 873, 875–77 (1975) (religious views on abortion); *Commonwealth v. Kudish,* 362 Mass. 627, 631, 289 N.E.2d 856, 859 (1972) (same) *United States v. Rojas,* 537 F.2d 216, 219 (5th Cir.1976) (attitudes toward drug-related crimes), *cert. denied,* 429 U.S. 1061, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977). *Cf. United States v. Peterson,* 157 U.S.App.D.C. 219, 225, 483 F.2d 1222, 1228 (attitudes toward firearms), *cert. denied,* 414 U.S. 1007, 94 S.Ct. 367, 38 L.Ed.2d 244 (1973); *Commonwealth v. Mascolo,* 6 Mass.App.Ct. 266, 270–71, 375 N.E.2d 17, 22–23 (obscenity), *cert. denied,* 439 U.S. 899, 99 S.Ct. 265, 58 L.Ed.2d 247 (1978); *see Kuisel v. Farrar,* 6 Mich.App. 560, 563, 149 N.W.2d 894, 895 (1967) ("The court is required to give sufficiently detailed factual information to the jurors so that they can intelligently answer the questions presented on their *voir dire* examination").

The United States Supreme Court has divided cases involving racial issues into two categories: (1) those reflecting "special circumstances," *see Ham v. South Carolina,* 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973) (black defendant claimed he was framed on drug possession charge because of civil rights activities); *Aldridge v. United States,* 283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054 (1931) (defendant charged with violent crime and victim were of different races), and (2) those in which the defendant is a member of a minority group but "special circumstances" are lacking. *See Ristaino v. Ross,* 424 U.S. 589, 597, 96 S.Ct. 1017, 1021, 47 L.Ed.2d 258 (1976) (defendant charged

Other courts have addressed the problem more directly by outlining the facts and then asking the prospective jurors, in effect: "Would you be prejudiced against the defendant because of the specific controversial matter in this case?"[13] Courts more often have taken this latter approach when political attitudes were the controversial issue. *See United States v. Chapin,* 169 U.S. App.D.C. 303, 318–19, 515 F.2d 1274, 1289–90, *cert. denied,* 423 U.S. 1015, 96 S.Ct. 449, 46 L.Ed.2d 387 (1975); *United States v. Giese,* 597 F.2d 1170, 1181–82 (9th Cir.), *cert. denied,* 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 405 (1979); *United States v. Mattin,* 419 F.2d 1086, 1087–88 (8th Cir.1970); *United States v. Owens,* 415 F.2d 1308, 1314–15 (6th Cir.1969), *cert. denied,* 397 U.S. 997, 90 S.Ct. 1138, 25 L.Ed.2d 406 (1970); *United States v. Dennis,* 183 F.2d 201, 226–28 (2d Cir.1950), *aff'd on other grounds,* 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951); *United States v. Malinowski,* 347 F.Supp. 347, 355 (E.D.Pa.1972) *aff'd on other grounds,* 472 F.2d 850, *cert. denied,* 411 U.S. 970, 93 S.Ct. 2164, 36 L.Ed.2d 693 (1973); *State v. Weitzman,* 121 N.H. 83, 86–87, 427 A.2d 3, 5–6 (1981). *But see United States v. Furey,* 491 F.Supp. 1048, 1054–55 (E.D.Pa.), *aff'd,* 636 F.2d 1211 (1980), *cert. denied,* 451 U.S. 913, 101 S.Ct. 1987, 68 L.Ed.2d 304 (1981); *Commonwealth v. Harrison,* 368 Mass. 366, 369–72, 331 N.E.2d 873, 875–77 (1975).

The gist of appellant's proposed inquiry into possible jury prejudice because of his political beliefs and affiliations is contained in his proposed questions, 20, 21, 24 and 32, which read in part as follows:

20. The evidence in this case will show that Mr. Cordero is either a member of or a supporter of an organization known as Vietnam Veterans Against the War.

. . . .

(d) How many of you have heard or read about the Vietnam Veterans Against the War?

(e) . . . How would this affect your ability to sit on this case . . . ?

21. . . . .

(g) [Appellant] is accused of throwing leaflets into the Senate Gallery and making a speech which in essence denounced the United States and other countries for planning World War III. How many of you would characterize your own feelings as being in complete disagreement with those expressed in [appellant's] speech . . . ? . . . Having those feelings, would it be difficult for you to be completely fair and impartial in sitting as a juror in this case?

24. Have you read or heard anything about other protest activities of the Vietnam Veterans Against the War of the Revolutionary Communist Party[?] If

---

with violent crimes and victim were of different races, but whereas federal trial court must make inquiry about racial prejudice under supervisory rule of *Aldridge, supra,* state court need not do so, as a constitutional matter, where racial issues are not "inextricably bound up with the conduct of the trial" as in *Ham, supra* ). In cases reflecting special circumstances, courts during *voir dire* must inquire into possible racial prejudice upon the defendant's request. *See Rosales-Lopez v. United States,* 451 U.S. 182, 191–92, 101 S.Ct. 1629, 1635, 68 L.Ed.2d 22 (1980) (plurality opinion). As to other cases, "if the external circumstances of the case indicate a reasonable possibility that racial or ethnic prejudice will influence the jury's evaluation of the evidence," *id.* at 192–93, 101 S.Ct. at 1636, the court may make a "more generalized but thorough inquiry into the impartiality of the veniremen." *Ristaino, supra* at 598, 96 S.Ct. at 1022.

13. *Rosales-Lopez,* 451 U.S. at 193, 101 S.Ct. at 1636 (alienage); *Coleman v. United States,* D.C.App., 379 A.2d 951, 954–55 (1977) (religion); *Government of the Virgin Islands v. Felix,* 569 F.2d 1274, 1276–78 (3d Cir.1978) (nationality); *United States v. Daily,* 139 F.2d 7, 9 (7th Cir.1943) (same); *People v. Dallas,* 85 Ill. App.3d 153, 164–67, 40 Ill.Dec. 110, 119–120, 405 N.E.2d 1202, 1211–12 (1980) (same), *cert. denied,* 450 U.S. 1000, 101 S.Ct. 1708, 68 L.Ed.2d 202 (1981); *State v. Darling,* 208 Kan. 469, 476–78, 493 P.2d 216, 222–23 (1972) (abortion); *Adams v. State,* 200 Md. 133, 138, 88 A.2d 556, 559–60 (1952) (same). *Cf. Musgrove v. United States,* D.C.App., 441 A.2d 980, 983 (1982) (police brutality); *Commonwealth v. Jones,* 9 Mass.App.Ct. 83, ——, 399 N.E.2d 1081, 1095–97 (1980) (attitudes toward police officers).

so, would anything you have heard or read come into play in your consideration of this case? . . .

32. Have any of you or any close friends, family members or associates ever been a member of any organization which had as one of its objectives opposition to Communism? . . .

The issue, therefore, is whether the trial court abused its discretion in declining to incorporate into *voir dire* examination the substance of these questions.[14]

Appellant's political views and associations, especially his advocacy of "revolution" and his membership in the Revolutionary Communist Party, constitute "matters concerning which . . . the population at large is commonly known to harbor strong feelings." *Robinson, supra* at 270, 475 F.2d at 381. Moreover, appellant's controversial political views and affiliations were "inextricably bound up with the conduct of [his] trial," *Rosales-Lopez, supra* 451 U.S. at 189,

101 S.Ct. at 1634. They were among the basic facts underlying his alleged offense; they would be evident to the jury as soon as the jury learned (as inevitably it would from the government's case-in-chief) what he said in his protest statement and had the opportunity to examine his leaflet.[15] Appellant's question 21(g), describing his protest statement, should have put the trial court on notice that political issues could not be excised.[16] And yet the trial court took no action to minimize the likelihood of prejudice to appellant from the controversial matters inextricably bound up with the trial. The court did not outline the facts of the case to the prospective jurors in a way that alerted them to the political issues involved. Nor did the court ask prospective jurors whether they would be prejudiced against appellant because of his political views or associations or, after outlining the facts, whether they could be impartial in this case. Rather, the court said only that appellant was charged with using loud lan-

14. Even where the court is obliged to examine the prospective jurors as to the party's proposed subject matter, it need not propound *voir dire* questions in the particular form requested by a party. *United States v. Peterson, supra* at 225 n. 32, 483 F.2d at 1228 n. 32. And, "[s]imply because counsel may have included in a void dire question some overly broad or legally collateral matter, the court should not totally reject an entire line of otherwise relevant inquiry." *Commonwealth v. Davis,* 282 Pa.Super. 51, 422 A.2d 671, 673 (1980); *see Harvin v. United States,* D.C.App., 297 A.2d 774, 777 n. 4 (1972).

On the other hand, counsel should refrain from proposing, as counsel did here, more questions than necessary for a fair *void dire.* If proposed *voir dire* questions are so far afield that their significance is not obvious, it is up to counsel to explain to the trial court why they should be given. *See United States v. Van Drunen,* 501 F.2d 1393, 1399 (7th Cir.), *cert. denied,* 419 U.S. 1091, 95 S.Ct. 684, 42 L.Ed.2d 684 (1974); *Rose v. Sheedy,* 345 Mo. 610, 611, 134 S.W.2d 18, 19 (1939).

15. This is not a case in which the defendant's controversial views surfaced only in connection with an impermissible defense. First—and contrary to our dissenting colleague's contention—the government itself brought out these issues in its case-in-chief. Inevitably, appellant's defense had to deal with them. Second, appellant's defense—that he had intended to speak only to spectators in the gallery and

therefore lacked specific intent to disturb the Senators—was allowable, if unsuccessful. Appellant did not claim that he lacked specific intent because, even though Senators may have overheard, his only motive was political and/or protected by the First Amendment. *Cf. United States v. Cullen,* 454 F.2d 386, 390–92 (7th Cir.1971) (trial court rejected jury instructions embodying defendant's theory that he lacked specific intent to burn draft card because he was motivated to do so by religious beliefs). Because the court in *Cullen* correctly held that the proffered defense would improperly allow the jury to judge the defendant's actions "by the end which his means were designed to serve," *id.* at 392, the court did not err in rejecting proposed *voir dire* questions "relating to [prospective jurors'] religious beliefs and attitudes toward authority." *Id.* at 390.

16. *Cf. United States v. Gordon,* 634 F.2d 639 (1st Cir.1980) (defendant's status as "certified Republican Presidential candidate" and "decorated combat infantry veteran" was not inextricably bound up with mail-fraud trial); *United States v. Perez-Martinez,* 525 F.2d 365 (9th Cir.1975) (defendant's Cuban nationality was not inextricably bound up with trial for conspiracy to deal in heroin); *People v. Velarde,* 200 Colo. 374, 616 P.2d 104 (1980) (defendant's atheism was not inextricably bound up with robbery trial).

guage in the Senate gallery, a "disturbing the peace type". offense.

In summary, when the court asked the prospective jurors whether they knew of any reason they might be biased, they were unaware of appellant's political views and affiliations—controversial facts which inevitably would come before them at trial. We conclude, accordingly that the trial court abused its discretion by using its "regular *voir dire*" rather than "tailor[ing its examination] to fit the circumstances of the case upon which the jurors will sit . . . ." *United States v. Baker*, 638 F.2d 198, 201 (10th Cir.1980).[17]

 We reject the government's contention that, even if the trial court abused its discretion by conducting an inadequate *voir dire* examination, appellant's rights were not substantially prejudiced by the court's action. There is "substantial preju-

dice to the accused" in the context of *voir dire, Khaalis, supra* at 335, when "the procedure used for testing impartiality [does not] create[ ] a reasonable assurance that prejudice would be discovered if present." *Dellinger, supra* at 367.[18] The procedure used at appellant's trial created no such assurance. We therefore reverse appellant's conviction and remand for a new trial.[19]

*Reversed and remanded.*

KERN, Associate Judge, dissenting:

With all deference, the majority's reversal of this misdemeanor conviction for disturbing Congress while in session enshrines into the Chutzpah Hall of Fame the particularly ironic objection made by appellant to the conduct of his trial, alongside such other fabled defenses of gall as that presented by

---

17. The trial judge was not required to examine the prospective jurors on the subjects covered by the rest of appellant's politically oriented questions, since these questions were not "reasonably calculated to discover an actual and likely source of prejudice." *Robinson, supra* at 270, 475 F.2d at 381. Question 19 (whether prospective jurors had "negative feelings" toward people whose appearance and "life-style" were unconventional) was not aimed at revealing a sufficiently serious prejudice. *See Ham, supra,* 409 U.S. at 527–28, 93 S.Ct. at 850–51 (prejudice against people with beards is not constitutionally significant). *But see Dellinger, supra* at 369–70 (trial court abused its discretion in refusing to ask questions eliciting prospective jurors' attitudes toward "long hair, beards, unorthodox clothing, and life styles differing from [their] own"). Questions 25 and 28–31 (whether prospective jurors had worked for the State Department or Foreign Service or had been members of veterans' organizations, "fraternal or other" societies, lobbying groups, or anti-communist organizations) appear to have been aimed at discovering significant prejudice—bias against appellant because of his political beliefs or affiliations—but these questions were too sweeping; they were not "reasonably calculated" to discover prejudice against appellant because of his political views or associations. *See Robinson, supra* at 270, 475 F.2d at 381.

18. We note that any prejudice triggered by appellant's political views could have been heightened by the element of disorderliness in appellant's conduct. Although his was not a prosecution for a violent crime, such as assault

arising out of a political demonstration, *see Dellinger, supra* at 366–70, neither was it a case involving a completely non-violent act, such as election fraud. *See Connors v. United States,* 158 U.S. 408, 15 S.Ct. 951, 39 L.Ed. 1033 (1895). At trial, the government emphasized the violent element of appellant's behavior; for example, in rebuttal argument to the jury, the prosecutor compared appellant to the Iranian students who at that time were holding hostages in the American embassy in Teheran.

19. Appellant claims that Officer Mayo's testimony that he heard the President pro tem of the Senate pound his gavel and call for order was inadmissible hearsay. Hearsay evidence is a "statement being offered as an assertion to show the truth of the matters asserted therein." McCormick, Evidence § 246 at 584 (2d ed. 1972); *see Jenkins v. United States,* D.C.App., 415 A.2d 545, 547 (1980). "Hearsay includes neither non-assertive conduct nor assertive statements not offered to prove what is asserted." McCormick, *supra,* § 250 at 599–600. The President's pounding of the gavel was non-assertive conduct—not a "statement," and the words accompanying his act were not offered to show "the truth of the matters asserted therein," but rather to allow the jury to draw an inference from the fact that the words were spoken. *See United States v. Glasser,* 443 F.2d 994, 1000–01 (2d Cir.), *cert. denied,* 404 U.S. 854, 92 S.Ct. 96, 30 L.Ed.2d 95 (1971). Mayo's testimony was not hearsay, and the trial court did not err in admitting it.

the child who murdered his parents and then sought mercy on the ground he was an orphan.

Consider the irony of appellant's contention in this case: that his $300 fine for yelling in the Senate gallery should be reversed because the trial judge failed at *voir dire* to inquire specifically of the jurors if they might have a prejudice against appellant because of his political views and associations, yet it was the appellant who presented to the jury, *over government objection* both before and during trial, the *very matter of his political views and affiliations.* (Supp. Record at 13 and 53–54.)

It was appellant who insisted upon testifying, over the prosecutor's protest, that he was a twice-wounded combat veteran of the Vietnam War who was honorably discharged with a disability and then joined the Vietnam Veterans Against the War because he "wanted to end the Vietnam War." (Record at 53–54.) Surely, even cloistered appellate judges can discern that in today's world, in contrast to a decade ago, the knowledge that appellant had joined an organization of combat veterans dedicated to end the Vietnam War is scarcely apt to drive jurors to prejudicial anger against appellant.[1] Certainly, defense counsel recognized the appeal of appellant's organization as he hammered away about it to the jury. (Record at 99.)

The record also contains appellant's testimony that he came to the Senate gallery on the day of his arrest (after having "cased" it on the day before) because he "wanted to speak to the American people . . . and make a statement about World War III . . . I wanted the American people to understand that the government and the United States were planning and involved in preparing for World War III and did not at all care about the fact that millions of people around the world were killed . . . in a nu-

clear war . . . ." [2] (Record at 55–56.) When he arose in the Senate gallery, according to his own testimony (Record at 58), he shouted "those millionaires down there, are planning a World War III, they don't care how many millions are incinerated." In light of the recent statement by the Catholic Bishops on the dangers of nuclear war, appellant's political view of alarm concerning nuclear war would appear to put him on the side of the angels, figuratively speaking, so far as the jury was concerned.

Defense counsel in his argument (Record at 99), continued the political theme of the defense, pointing out to the jury the fact that appellant was a Purple Heart veteran who had honorably served his country in the Vietnam War and then, after enduring the crucible of combat, became a fierce advocate of world peace. Thus, appellant's attorney trumpeted in closing argument (Record at 100–02):

> And he gets accused because he got [up in] a gallery and said I don't want any more war, I don't want any more war. . . . (Record at 100.) He didn't think the Senators would listen because when he was in Vietnam being shot at, the Senators weren't listening then . . . .

> A person gets up and says no more war? We have had a nuclear accident. Let's not have a War over it. We have been to Vietnam. Let's not have another one. (Record at 101.)

> \* \* \* \* \* \*

> Is he trying to do something to prevent the war? Yes. What's disturbing here? We've got the wrong people on trial. Maybe it's the Roland Corderos of the World who are trying to show those of us who don't have enough interest, who just let events pass. (Record at 102.)

The majority, appearing to return to the Great Red Scare of the post-First World

---

1. Indeed, one of the leaders of appellant's organizations was just elected lieutenant governor of Massachusetts. Washington Post, November 7, 1982.

2. Appellant's defense at trial comes close to being in effect a plea of *nolo contendere;* he admitted standing and speaking while the Senate was in session without caring whether the Senate heard him or not. (Record at 57.)

War or at least the so-called McCarthy era, seizes upon the words "revolution" and the "Revolutionary Communist Party" which were contained in a typewritten, single sheet of paper (Supp. Record II at 2), appellant threw into the air in the gallery before he could be arrested and ejected. The majority posits that appellant's "advocacy of revolution" and "membership in the Revolutionary Communist Party," as depicted in the typed sheet,[3] are matters about which the population at large harbors strong feelings. Accordingly, the majority, ignoring the fact that appellant paraded before the jury his membership in an organization of former American soldiers who had served their country in Vietnam and his generally popular political views concerning world peace, concludes reversal is necessary because of the trial court's failure to ask the prospective jurors whether they could be impartial in light of appellant's political views or associations.[4]

Under the particular circumstances here, I am unable to agree that appellant suffered "substantial prejudice," which is the only ground under the decisional law of the District of Columbia for *not* upholding the trial judge in the exercise of the considerable discretion vested in him in his conduct of the *voir dire.* This test was announced by this court as recently as 1979. *Khaalis v. United States,* D.C.App., 408 A.2d 313, 335 (1979), *cert. denied,* 444 U.S. 1092, 100 S.Ct. 1059, 62 L.Ed.2d 781 (1980). Lo and behold, however, not only does the majority ignore the fact that appellant played upon his political views and political associations before the jury despite government protests, but the majority *now changes* the scope of review to be used henceforth by this court for complaints concerning the conduct of the *voir dire.*

For reversal, no longer must there be a showing by the accused on appeal that the trial court has abused its discretion in the *voir dire's* conduct to the "substantial prejudice of the accused," as enunciated in *Khaalis.* Now, the majority has imported word-for-word from the federal Seventh Circuit Court of Appeal's decision in the celebrated trial of Abbie Hoffman and the so-called Yippies, among others, for riots occurring in 1968, *United States v. Dellinger,* 472 F.2d 340, 367 (7th Cir.1972), a new test for determining whether the trial court in the District of Columbia has erred in conducting *voir dire.* The majority now pronounces:

> There is "substantial prejudice to the accused" in the context of *voir dire* when the procedure used for testing impartiality [does not] create [ ] a reasonable assurance that prejudice would be discovered if present. [*Supra* at 845, quoting *Dellinger, supra* at 367.]

In sum, according to the majority, the accused need not show that the *voir dire* he challenges has caused him "substantial prejudice;" now the government must demonstrate with "reasonable assurance" that any possible prejudice to the accused would have been discovered by the *voir dire* employed by the judge at trial. Since the majority is overruling a prior line of decisions by this court culminating in our 1979 *Khaalis* case and the appellant profited from his own reference at trial to his political associations and affiliations and hence incurred no substantial prejudice from the *voir dire* conducted, I must dissent.

3. Thus, the crudely lettered sheet refers to Vietnam and the possibility of World War III and reads at one point:

> People we got to make it a revolutionary civil war against them. Follow the leadership of the Revolutionary Communist Party and be determined to make revolution to end this system of misery.

4. The court asked standard questions at *voir dire,* referring to this case as a "disturbing the peace type" of offense. Appellant presented before trial an eight-page Proposed Voir Dire Examination composed of some 55 questions to be propounded to prospective jurors. (Record at 6–13.)